Argued June 19, reargued October 14, affirmed December 23, 1919, rehearing denied May 18, 1920.

## STATE v. BUTLER.*

(186 Pac. 55.)

**Criminal Law—Failure to Show by Record Disposition of Demurrer not Ground for Reversal.**

1. In view of Section 1626, L. O. L., providing that on criminal appeals the court must give judgment without regard to technical errors or defects, in a prosecution resulting in conviction of manslaughter, formal disposition of demurrer to the indictment was not so essential that silence of the record thereon constitutes a fatal defect, where defendant afterward entered plea of not guilty, and went to trial without objection or question.

**Homicide—Threat Admissible in Evidence Though not Directed Especially to Deceased.**

2. In a prosecution resulting in conviction of manslaughter, testimony of decedent's father that about eight months before the shooting defendant had said to him that, if he could not beat them any other way, he would do it with a Winchester, *held* admissible as a threat over objection that it was not directed especially toward deceased and was too remote; such threat having reference to a controversy about a road pursuant to which decedent was subsequently killed.

**Criminal Law—Testimony of Arrangement in Defendant's Absence not Hearsay.**

3. In view of Section 707, L. O. L., recognizing *res gestae* both as to facts in dispute and as to some act that becomes important as evidence of facts in dispute, in a prosecution resulting in conviction of manslaughter, the controversy having originated over a fence across a road, testimony tending to show the arrangement with other persons under which decedent came to be at the scene of the shooting on watch to see who was putting up the fence *held* not incompetent hearsay because arrangement was made in defendant's absence.

**Criminal Law—Homicide—Evidence of Other Crime as Showing Identity.**

4. In a prosecution resulting in conviction of manslaughter, the killing having taken place at defendant's fence, which he was put-

*The question of evidence of other crimes in criminal cases is discussed in a note in 62 L. R. A. 193.

On evidence in a criminal case of threats of accused or of person killed or injured, see note in 17 L. R. A. 654.

On responsibility for crime committed in fit of anger, see note in 10 L. R. A. (N. S.) 1032.

Authorities passing on the question which will reduce or mitigate the degree of homicide are collated in a note in 5 L. R. A. (N. S.) 809.    REPORTER.

ting up nightly to obstruct a road, decedent with others having been on watch to find out who was doing it, testimony of such others as to what occurred probably half an hour before the killing on the other side of the field from where the killing occurred, where the road went through the fence on that side, and that defendant then drew gun on the others when they were coming close enough to identify him, *held* admissible, and not objectionable as showing a collateral offense, and sufficient to justify the jury in concluding it was defendant.

Homicide—Declarations by Accused as to Position in Firing.

5. In a prosecution resulting in conviction of manslaughter, testimony of a deputy sheriff as to where defendant showed him he was when he fired the last shot at decedent, and about how far the place was from the panel in his fence, open on account of a road, which he had been putting up nightly, so that decedent with others had volunteered to watch for him, also how far the place was from that where empty shells were found, *held* admissible.

Criminal Law — Homicide — Argumentative Instruction on Self-defense.

6. In a prosecution resulting in conviction of manslaughter, instruction on the right of self-defense arising from an assault or attack with a dangerous weapon *held* properly refused as argumentative and invading the province of the jury.

Homicide—Harmless Error in Refusal of Instruction.

7. In a prosecution resulting in conviction of manslaughter, the refusal to defendant of his requested instruction referring to malice and ill will *held* harmless to him in view of the verdict negativing the existence of malice or ill will on his part.

Criminal Law—Following Language of Requested Instructions.

8. The trial court is not required to give charges asked for in the exact language in which they are requested, but need only cover the principles of law involved.

Homicide—Killing Manslaughter Unless Justifiable or With Malice or Deliberation.

9. Every killing is manslaughter unless it is justifiable or excusable, or is accompanied by malice or deliberation, when it becomes murder in the first or second degree.

Homicide—Killing in Anger Without Excuse or Justification is Manslaughter.

10. If defendant under provocation of a sudden attack grew angry and killed decedent without real or apparent necessity, the killing was not justifiable or excusable, and defendant was properly convicted of manslaughter.

Homicide—Evidence Sustaining Conviction of Manslaughter.

11. In a prosecution resulting in conviction of manslaughter, defendant having shot and fatally wounded decedent, who was watching a road through defendant's land to see if he was the

one who was putting up an obstructing fence every night, evidence *held* sufficient to sustain the verdict.

### Criminal Law—Reading Instructions Together.

12. Instructions must be read together, and cannot be considered each by itself.

### Homicide—Instruction on Threats not Abstract.

13. In a prosecution resulting in conviction of manslaughter, instruction as to the consideration of threats made by defendant against decedent in determining defendant's intent and malice *held* not erroneous as abstract; there being some evidence of threats.

### Criminal Law—Argument of District Attorney.

14. Though the language of the district attorney in argument was bitter and somewhat intemperate, reversal is not justified on that account alone.

### Criminal Law—Instruction not Coercing Jury—"Stubborn."

15. In a prosecution resulting in conviction of manslaughter, instruction to the jury by the court on their inability to agree, sending them back for further consideration, and urging them to try to agree, if possible, *held* not erroneous as coercive, despite the expression admonishing them not to get stubborn and say they would not; "stubborn" meaning "unreasonably unyielding."

### Homicide—Instruction on Self-defense.

16. In view of Sections 1371, 1909, 1914, L. O. L., in a prosecution resulting in conviction of manslaughter, instruction on self-defense *held* not erroneous in its limitation of defendant's right to take his adversary's life only to cases of threatened deadly harm or severe calamity "felonious" in character; the word "felonious" having been used as synonymous with great bodily injury.

### Criminal Law—False Assumption in Argument of District Attorney.

17. In prosecution resulting in conviction of manslaughter, the assumption by the district attorney in argument that certain witnesses had identified defendant in a certain place on the night of the killing *held* not reversible error as more in the nature of a misconstruction of the testimony than a positive and willful misstatement; the charge having instructed the jury to disregard statements not sustained by evidence.

From Jackson: FRANK M. CALKINS, Judge.

In Banc.

The defendant was indicted and charged with the crime of murder in the second degree. He was tried and convicted of the crime of manslaughter, and received an indeterminate sentence of from one to fifteen years.

The killing itself is not denied by the defendant, and grew out of the following facts: The defendant was the owner of a tract of land near Eagle Point in Jackson County, which was inclosed by a fence. For some time prior to the killing, there had been a controversy in the neighborhood over a road running through this tract of land, and as to whether such road was a valid county road. McDonald Stewart, the individual killed by defendant, was a neighbor living with his father near one side of defendant's tract of land and apparently interested in the opening of the road in question. The road supervisors, ostensibly under authority from the County Court, had opened the fence on each side of defendant's tract of land where the road went through, a number of times prior to the killing. The fence would remain open during the day, but would be put up again in the night. It appears to have been the belief of some of the people who lived in the neighborhood, that the defendant was putting up the fence, and he had been threatened with prosecution for closing the alleged county road. The defendant, on the other hand, claimed that some third party was the individual who had been putting up the fence at night, and that it was done for the purpose of getting him into trouble.

On the night in question the supervisor had arranged with McDonald Stewart, the deceased, and with a Mr. Jackson, who also lived in the neighborhood, to watch the fence, for the purpose of settling the question as to who was putting it up at night. The road ran through the field from west to east, and it was arranged that the supervisor and Jackson were to watch the fence on the west side, while the deceased was to watch it on the east side. At first it was intended that another neighbor, by the

name of Patrick, should share with Stewart in watching the fence on the east side, but he was not able to go and the deceased went alone.

Dutton, the road supervisor, and Jackson went up to the vicinity of the fence on the west side that evening in an automobile, accompanied by Mrs. Jackson, stopped the automobile under a tree, and waited. Dutton and Jackson walked a short distance over toward the fence. It was a moonlight night and presently they saw a man come to the gap of the fence and commence putting it up. They went back to the automobile and drove it up to the vicinity of the gap, but by this time there was no one in sight. They got out of the automobile and started along the fence, Dutton apparently being in the lead. Presently they saw a dark object, which they took to be a man, behind the fence about 30 feet away, but so hidden by the fence that they could not identify him. Mr. Dutton continued to advance until he got within about 15 feet of the man, who then partly raised up and pointed a gun at Dutton over or through the fence. Dutton said, "For God's sake, don't shoot me over this fence," and stepped back two or three steps. The person in the fence then turned the gun on Jackson, who also turned back, and they both walked to the car, got into it and went home. This occurred between 7:25 and 8:25 o'clock—probably from the testimony, about 8 o'clock. Dutton and Jackson could not identify the person in the fence, but in a general way they described his clothing and they noticed in the moonlight the polished brightness of the gun barrel. The shooting occurred near the gap on the east side where McDonald Stewart was watching.

About 9 o'clock that night, or a little before, the defendant telephoned to the sheriff from his home about the shooting. He claimed that after the shooting he had walked from the place where it occurred down to his house before telephoning, so that the shooting may be assumed to have occurred somewhere in the neighborhood of 8:30, or possibly a few minutes later. The defendant claimed he was walking along down a fence in the vicinity of the gap when someone fired two shots at him. He claims that, at the second shot, he saw the flash from behind the tree, about 100 feet away; that he then fired himself, two shots toward the point where the flash had occurred; that a third shot was then fired from the tree and hit the fence close to where he stood; that he then got down behind the fence, and seeing a dark object, which he took to be part of a man's person, behind the tree, fired a third shot, when the man behind the tree fell and uttered some sound, which indicated to the defendant that he was hit. The defendant then, as he says, got up and walked down to his home and telephoned to the sheriff.

The defendant at the time of the trial claims he did not move down the fence toward the south after the third shot was fired by the other man; but there was testimony tending to show that on the night of the killing he told Anderson, the deputy sheriff, that he had crawled down the fence until he came to a place where he could see the black spot, which he took to be part of the man's person behind the tree, before he fired the fatal shot. According to Anderson's testimony, defendant showed him on the ground about the point from which he fired this shot; and Anderson estimated the distance as about 90 feet from the gap. Two discharged shells were found the next morning at the gap in question, and

it was the theory of the state that the defendant—after firing these two shots and after the last shot was fired by the deceased—crawled along down the fence out of sight of the deceased, until he got far enough past the direct line of the tree so he could see the deceased behind the tree, and then deliberately took aim and fired the shot in question.

The deceased made no statement and there was no direct evidence as to what occurred at the time of the shooting, except that of the defendant himself. The state depended upon the circumstances surrounding the transaction to show that the defendant was the aggressor, or at least that he fired the last and fatal shot when it was unnecessary and could have been avoided without danger to the defendant. The defendant, on the other hand, admitted the shooting but claims he acted entirely in apparently necessary self-defense, and only to protect himself from danger of death or great bodily harm.

From the verdict of manslaughter only, it must be supposed the jury found that the killing was not entirely justified or excusable; but that there was no malice, or at least no sufficient evidence of malice, on the part of the defendant.

The deputy sheriff arrived at the place of the killing about 11 o'clock. According to the testimony, no one went there until the sheriff arrived. The doctor did not get there until about midnight. The deceased was still alive at 11 o'clock when the deputy sheriff arrived, but he died a short time afterward and before the arrival of the doctor. The bullet had passed through the thigh, shattering the thigh bone. According to the testimony of the physician, death was caused by hemorrhage.     AFFIRMED.

96 Or.—15

For appellant there was a brief and an oral argument by *Mr. O. C. Boggs.*

For the state there was a brief with oral arguments by *Mr. George M. Brown,* Attorney General, and *Mr. George M. Roberts,* District Attorney.

BENNETT, J.—There are about 25 assignments of error, referring chiefly to the rulings of the court as to the introduction of evidence and the instructions given and refused.

1. It appears, however, from the record that the defendant was arraigned and filed a demurrer to the indictment and that he afterward entered a plea of not guilty and went to trial. The original record did not show affirmatively what disposition was made of the demurrer. The defendant now urges this as a fatal defect in the trial proceedings, but it is a very technical contention and, we think, is without merit.

The case of *State* v. *Walton,* 50 Or. 142 (91 Pac. 490, 13 L. R. A. (N. S.) 811), and *State* v. *Cartwright,* 10 Or. 193, cited by appellant, do not seem to be in point. In the Walton case there had been no *plea* to the indictment, and in the Cartwright case the question was whether or not it was necessary for the record to show that the defendant was present at the trial. In the case at bar both of these facts appear fully from the record. We think the formal disposition of the demurrer was not so essential that the silence of the record thereon would constitute a fatal defect, where the defendant afterward entered a plea of not guilty and went to trial without objection or question: *State* v. *Sullivan,* 52 Or. 614 (98 Pac. 493). The indictment in this case was

in the usual form and seems to have been entirely regular and sufficient.

Section 1626, L. O. L., provides that on criminal appeals the court "must give judgment without regard * * to technical errors, defects or exceptions which do not affect the substantial rights of the parties." Here, the indictment being entirely sufficient, the failure of the court to formally pass upon the demurrer could not possibly prejudice the defendant in any way. The provision of the statute is, therefore, entirely controlling, and the case cannot be reversed upon such a technical omission of formal proceedings: *State* v. *Pender*, 72 Or. 94 (142 Pac. 615); *State* v. *Leonard*, 73 Or. 451 (144 Pac. 113, 681). Besides it appears from a supplementary transcript filed in this court that the demurrer was in fact overruled, but that the clerk by some inadvertence overlooked the entry at the time in the journal and it is now remedied by an order entered *nunc pro tunc.*

2. Mr. H. J. Stewart, father of deceased, testified that about eight months before the shooting the defendant had said to him:

"If I can't beat you fellows any other way, I will do it with a Winchester."

It is urged that this threat was inadmissible because it was not directed especially toward the deceased, and because—as is claimed—it was too remote. We think this contention cannot be sustained under the circumstances of this case. On cross-examination the witness stated:

"I asked Mr. Butler what he intended to do *about the road,* and he said he wasn't going to do anything. I told him then we would have to commence suit to open the road. I started home and then is when he made the statement: 'If I don't beat you

fellows any other way, I will do it with a Winchester.' "

From this testimony we think the jury had a right to infer that the threat, if made by defendant as alleged, had reference to the controversy about the road, over which the killing occurred, and that it referred generally to all the "fellows" who were pressing the opening of the road.

The authorities cited by appellant are not applicable to a case like this and do not support his position. In the case of *State* v. *Meyers,* cited from the 57 Or. 50 (110 Pac. 407, 33 L. R. A. (N. S.) 143), the threat which the court held was erroneously admitted, did not refer in any way to the transaction over which the deceased was killed, or to any class to which he belonged. The opinion in that case carefully excepts a case like this in the following language:

"And threats against a particular class of persons, as, for instance, a threat to kill all policemen, are admissible in a prosecution for killing a member of the particular class indicated in the threats."

Here the threat was clearly broad enough to have reference to everyone who was pressing and enforcing the opening of this road; and it had reference apparently to the very controversy about which the killing occurred.

3. Testimony was admitted over the objection of the defendant tending to show the arrangement under which the deceased came to be at the scene of the shooting; and it is urged, that because this arrangement was made in the absence of the defendant, it is hearsay and incompetent, but we think this is entirely settled adversely to the defendant by the late case of *State* v. *Farnam,* 82 Or. 211 (161 Pac. 417, Ann. Cas. 1918A, 318), in which case the

defendant was charged with the killing of one Edna Morgan, who appears to have been his sweetheart, and it was the theory of the state that the killing was on account of the deceased's unfortunate condition, and that the defendant, for the purpose of avoiding the consequences to himself, had either voluntarily and intentionally killed her, or unintentionally done so in the attempt to produce an abortion. It became important to show where the young girl went on the evening of the killing and her purpose. A witness was called and asked:

"Now tell the jury what Edna told you about going home with you that evening."

The witness answered:

"She said she could not come because she thought Roy was coming down."

Mr. Justice HARRIS, in an opinion, which was concurred in by a majority of the court, considers and discusses all of the authorities carefully and at great length, and reached the conclusion that the testimony was properly admitted, saying:

"If the doing of an act is a material question, then the existence of a design or plan to do that specific act is relevant to show that the act was probably done; * * and, considering the plan or design as a condition of the mind, a person's own statements of a present existing state of mind, when made in a natural manner and under circumstances dispelling suspicion and containing no suggestion of sinister motives, only reflect the mental state, and therefore are competent to prove the condition of the mind, or, in other words, the plan or design * * . The whereabouts of Edna Morgan was a material issue. It was important to show what she did and where she went. The state contended she met the defendant and accompanied him to the Beamer barn. Evidence of her declaration was competent to show what was

in her mind, and that what she intended to do was probably done. * * The language used by her was only one way of stating that she intended to meet Roy Farnam. * * However, as the writer thinks, the true theory of the rule is that the statement of the deceased is original evidence of her intention, which the jury can consider as a circumstance indicating that she probably did what she intended to do, then on that theory no section of the Code is transgressed. * * Being competent to show what Edna Morgan intended to do, the testimony of Mabel Barton was not rendered incompetent for all purposes merely because it was incompetent for the purpose of connecting Roy Farnam with the alleged crime."

Here, as in the Farnam case, the evidence was offered not for the purpose of binding the defendant in any way, but for the sole purpose of explaining how the deceased came to be at the point in question, at the time in question, and what was his purpose and intention in being there.

Section 707, L. O. L., is in direct line with the conclusion of Mr. Justice HARRIS in the Farnam opinion. It provides:

"Where, also, the declaration, act, or omission forms part of a transaction which is itself the fact in dispute, *or evidence of that fact,* such declaration, act, or omission is evidence as part of the transaction."

This section recognizes two cases of *res gestae*—one the *res gestae* of the fact in dispute, and the other the *res gestae* of some act that becomes important as evidence of the facts in dispute.

Here, the act of the deceased in going to and being at the place where the killing occurred, and his purpose in going there, became very important; and it was entirely proper to show by his declarations at the time and as a part of the transaction, *of going*

*down there,* what was the    plan and purpose for which he went.

4. The testimony of Dutton, Jackson and Mrs. Jackson, as to what occurred probably half an hour before the killing at the point on the other side of the field from where the killing occurred, where the road went through the fence on that side, was admitted in evidence, and it is claimed that this was also error. This contention also must be overruled. The testimony was entirely sufficient to justify the jury in concluding that it was the defendant who was putting up the fence on that side, and who drew the gun on Jackson and Dutton when they were about to get close enough to identify him. It is true they were not able to say that defendant was the man; but it may have seemed to the jury unlikely and improbable that there were two men out there in the night-time, with guns, at the different gaps in the fence within half an hour's time. While not able to identify the defendant, these witnesses were able to describe, in a general way, the clothes which the man wore, and the gun seems to have had a peculiar bright and polished barrel. The clothes which the defendant wore on the night in question were described by the witnesses, and indeed they were seen and inspected by the jury; and the jury had an opportunity to compare the description of them made by the different witnesses. It seems entirely reasonable for the jury to have concluded then, that the person at the west side of the fence was the defendant.

The conduct of the defendant at that time and place was really a part of the transaction which led up to the killing. It was a circumstance tending to show the motives and feelings of the defendant, and tended to show inferentially, what occurred a few

minutes later at the other side of the field, when the deceased was killed; and to show who was the aggressor in the fatal affray. It tended to show that the defendant was the person who had been putting up the fence, and with his other declarations, that he was intending to cover up his identity; and the jury had a right to draw the inference, that he had the gun with him that night, for the purpose of preventing anyone from getting close enough to him to identify him; and from his actions there and from the plan and purpose of the deceased in going down there to watch the fence and identify the person who was putting it up that night, and from the other circumstances, the jury had a right to reason out as best they could what probably really happened between the deceased and defendant at the precise minute of the shooting. They had a right to wholly disregard all or any part of defendant's story as to who was the aggressor if they believed it unreasonable or improbable under the circumstances.

The cases cited by appellant upon this question are clearly and obviously distinguishable from the case at bar. Here the evidence was not offered for the purpose of showing that the defendant had committed another crime; but because it had a direct bearing upon the crime charged in the indictment.

In the cases cited by appellant the collateral offense sought to be proved was entirely disconnected from the crime charged. This case is much more nearly like the case of *State* v. *La Rose,* 54 Or. 555 (104 Pac. 299), than it is like the cases cited by appellant. In the La Rose case the defendant was charged with the killing of one Hyman Newman, with a piece of rusty gas-pipe wrapped in a newspaper; and it was shown that about 16 hours before the defendant had struck a man by the name of

Herman on the head with a weapon wrapped in the same way; and that within about 24 hours after, he had struck and robbed a Chinaman with the same kind of a weapon wrapped in the same way; and it was held by a unanimous court that the testimony was admissible.

If testimony like that, in this case, of the conduct of the defendant in regard to the same controversy, and at a time so immediately before the killing, was not admissible for the purpose of showing his feeling and motive and intent at the time of the killing a few minutes afterward, at the other side of the same fence and at the other end of the same road, and in regard to the same general transaction, with reference to a person who was trying to identify him in the same way, then it would be impossible to convict anyone of a crime on circumstantial evidence, and all one would have to do to go unscathed of justice, would be to choose a time for the commission of a crime when there were no third parties present and no direct evidence; and when his own story would be the only possible direct testimony.

5. The testimony of Paul Anderson, deputy sheriff, as to where Butler showed him that he was when he fired the last shot, and about how far that place was from the panel which had been opened, and from the place where the shells were found, was clearly admissible. The fact that defendant did not tell him in words exactly where he stood, but showed him about where it was, did not make this evidence any the less admissible, although it might have affected the weight of the testimony. His testimony showed clearly that the defendant told him he had crawled down the fence for quite a distance, and this was entirely sufficient to support the charge of the court in that regard.

6. The defendant asked the court to charge the jury as follows:

"An assault or attack with a dangerous weapon will almost invariably justify the killing of the assailant in self-defense, except when it is manifest to the defendant that the weapon cannot or will not be used for the purpose or killing or inflicting great bodily harm."

And the refusal of this instruction is assigned as error. The instruction was argumentative and invaded the province of the jury. Whether an assault or attack with a dangerous weapon will justify the killing of an assailant will depend upon the circumstances, and is clearly a question for the jury. The court had no right to say to the jury that such an attack "would almost invariably" justify killing.

7. The instruction asked for by the defendant in the eleventh assignment of error might probably have been given by the court, but its refusal could not in any way prejudice the defendant for it referred to malice and ill will, and the jury must have found that there was no malice or ill will, or the verdict would have been for murder in the second degree instead of manslaughter. Besides, the court charged the jury absolutely that the defendant had a right to defend himself, if he was in danger or believed himself to be in danger, to the extent of taking the life of the deceased. One of the charges given was as follows:

"The law gives to every man the right of self-defense. This means, that if a man is assaulted, he may defend his life or his person from great bodily harm. He may repel force by force and he may resort to such force as under the circumstances surrounding him, may be reasonably necessary to repel the attack upon him even to the taking of the life of his adversary.

"If then you should find in the consideration of this case the defendant honestly believed that he was being feloniously assaulted, and did honestly believe that he was then and there in danger of death or great bodily harm, he would be justified in defending himself even to the extent of taking the life of his adversary.

"As I said, it is incumbent upon the prosecutor to prove to you beyond a reasonable doubt that the killing was not done in self-defense, and if, from the evidence offered in the trial of this case, you find that the prosecution has not proved beyond a reasonable doubt that the killing was not done in self-defense, you should find a verdict for the defendant."

And other instructions given by the court were as absolute in this regard. These charges were equivalent to saying to the jury that if it was necessary, or apparently necessary, to kill the deceased to save his own life, or to save himself from great bodily harm, the defendant was justified in doing so, without regard to malice or anything else.

8. The twelfth, thirteenth, fourteenth, and fifteenth assignments of error were fully and entirely covered by the general charge. It is well settled that the court is not required to give charges asked for in the exact language quoted, and we think the charge given by the court was, on the whole, quite favorable to the defendant and fully covered the principles involved in the charges asked for and refused.

9, 10. The sixteenth assignment of error has reference to an instruction defining manslaughter. It is urged that there was no evidence of manslaughter, and that this instruction was abstract. But every killing is manslaughter unless it is justifiable or excusable; or is accompanied by malice or deliberation, when it becomes murder in the first or second degree.

In this case, if the jury was in doubt as to whether there was any malice and was satisfied the killing was not justifiable or excusable, it was bound to find a verdict of manslaughter. All the circumstances were before the jury, and they may have inferred that the defendant, under the provocation of a sudden attack, grew angry and killed the deceased without any real or apparent necessity. Under such circumstances the killing would not be justifiable or excusable, and the verdict of manslaughter would be sustained.

Section 1902, L. O. L., provides:

"Every other killing of a human being by the act, procurement, or culpable negligence of another, when such killing is not murder in the first or second degree, or is not justifiable or excusable, as provided in this chapter, shall be deemed manslaughter."

11. There was ample evidence to sustain a verdict of manslaughter in this cause.

12. The eighteenth, twentieth, twenty-first, twenty-second and twenty-third assignments of error refer to instructions given by the court. We think these instructions, when read together with the others, are substantially correct. Some of the instructions, when taken from the remainder of the charge and read by themselves, might be subject to possible criticism; but in the light of the entire charge this ceases to be true, and we think the charge on the whole was entirely favorable to the defendant.

13. The nineteenth assignment of error refers to the following charge:

"You should also consider the evidence of any threats made by the defendant against Stewart, if any are shown, in aiding you to determine the intent with which the defendant committed the act, and also to aid you in determining the question of malice on the part of the defendant."

It is urged that there was no evidence of any threats by the defendant against Stewart, but as we have already seen, the threat testified to by Stewart's father was broad enough to cover him, if the jury should find he was one of the persons interested in the opening of this road.

14. We think there is nothing in the record which would justify us in reversing the case on account of the argument of the district attorney. The language may have been bitter and somewhat intemperate, but it seems well settled in this state that such language, when going no further than in this case, will not justify a reversal.

15. Neither do we think the cause can be reversed on account of the instruction to the jury given by the court when they were unable to agree, in which the court sent them back for further consideration of the case, and urged them to try to reach an agreement if possible. The language in no way coerced them. It was nothing more than a fair and proper request upon the part of the court for the jury to give the matter further consideration, and try to reach an agreement, if possible. The language of the court was as follows:

"Now, when you go back I want you to do the best you can to harmonize your differences, and everybody remember that it must be a very severe strain upon a defendant to go through an ordeal of this kind, and he is entitled to a verdict of whatever it shall be, and it is also important that the state shall have a verdict, as we will have to try the case over again if we do not get a verdict, and I want you to try not to lose your tempers and to try your best to harmonize your differences and everybody try to do right and to do what your consciences think should be done but do not get stubborn and say you won't. Sometimes jurors get tired and I know it is hard to ask jurors to do this work but

some jury will have to solve this and so I will ask you to do the best that you can to solve it.''

There seems to be nothing coercive in this instruction. On the contrary, it seems to have been a very temperate and reasonable statement of the duty of the jury to meet each other's views in a reasonable spirit and try to reach a unanimous conclusion if they conscientiously could. There seems to be nothing which would indicate that it was in any way the duty of any juror to give up his honest views or accede to a verdict which he could not conscientiously concur in.

Much stress is placed upon the words admonishing the jurors to not ''get stubborn and say you won't.'' But this must be referred to what went just before it, in which the jury was told to try ''to harmonize your differences, and if possible, try to do right and do what you conscientiously think should be done.'' And when read in this light it was entirely proper. One of the meanings of the word ''stubborn'' given by the International Dictionary is ''Unreasonably unyielding.'' And this was, evidently from the context, the sense in which the word was used in the instruction.

Judge THOMPSON, in his work on Trials (2 ed.) vol. 3, at pages 2123, 2124, cites with approval three different instructions given by three different courts, in which the same word, or its exact equivalent, is used in a similar instruction in the same way; one being passed upon by the Supreme Court of Nebraska in *Jessen* v. *Donahue,* 4 Neb. (Unof.) 838 (96 N. W. 639); another by the Supreme Court of Michigan in *Mead* v. *Harris,* 101 Mich. 585 (60 N. W. 284); and one by the Supreme Court of South Carolina, *Caldwell* v. *Duncan,* 87 S. C. 331 (69 S. E. 660). It seems well settled in this state, as well as gen-

erally, that the trial court can, with propriety, admonish the jury in a temperate and moderate way, as to its duty in considering a case and in trying to reach an agreement: *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441); *State* v. *Hawkins,* 18 Or. 476 (23 Pac. 475). The instruction of the court in this case seems to be well within the rule.

In *State* v. *Saunders,* 14 Or. 300 (12 Pac. 441), the exact instruction complained of does not appear in the report of the case, but we have examined the record in that case, and the instruction, in so far as it is important on this question, was as follows:

"That it was their duty to try and agree upon a verdict. * * That the court could now discharge a jury when there was no hope of their agreeing on a verdict— * * still it was of great importance that the jury agree and the case be decided and ended. * * That in discussing the case in the jury room, it was the duty of each juryman to carefully hear and consider the opinion of his fellows; that it might happen that all the jurymen would not remember or view the evidence alike, and they should discuss all matters pertaining to the case freely and with candor—that it was not proper for one juryman to announce that his views were correct without first considering the opinions of his fellows. If jurors would never in any manner change or modify their impressions after hearing their fellows, verdicts would not often be rendered and the jury system would be a failure. That they would have to remain together and could not separate until they agreed upon a verdict and brought it into court."

In relation to this instruction the court said:

"The objection to the instructions to the jury, as to their duties—telling them the effect of a disagreement at common law, and of how juries were kept together until they did agree; the mitigation of the rule in the United States; and remarking to them that they would have to remain together, and could

not separate until they agreed on a verdict, and brought it into court—cannot be entertained. It was proper for the court to inform the jury respecting their duty; advise them how they should consider the matter before them, and the course to pursue in reaching a conclusion.''

In *State* v. *Hawkins*, 18 Or. 476 (23 Pac. 475), the court had charged the jury:

''I need not admonish this intelligent jury that it is important to the ends of justice, and to secure public respect for our judicial tribunals, that juries agree upon verdicts in cases submitted to them, so that causes may be determined and new trials and delays of justice avoided.''

This instruction, like the one in the Saunders case, was held to be within the fair province of the court and to be no error, the court saying:

''Such instructions announce no principles of law further than to impress upon the minds of jurors the duty of considering the case in all of its bearings fairly and without prejudice, and to endeavor to reach a just conclusion.''

And again:

''It was proper for the court to inform the jury respecting their duty; advise them how they should consider the matter before them, and the course to pursue in reaching a conclusion. * * * No intelligent or conscientious juror could be misled by such an admonition. He understands the motive of the court not to be to control or coerce his judgment contrary to his conscientious convictions, or to induce him to yield to the judgment of his fellows without the fullest comparison of all of the facts. It is impossible to see in what manner such advice to the jury could have injured the defendant.''

At the time the instruction was given the jury had not been out an unreasonable time—only about 7 hours—and had not reported they were unable to

agree; but came in to ask the court for further instructions. The case at bar is clearly distinguishable from that of *State* v. *Ivanhoe*, 35 Or. 150 (57 Pac. 317). In the latter case the jury had been out all night and had reported they were unable to agree. Much stress was laid upon these facts in passing upon the case on appeal. Also, the instruction was much more coercive in its tendency than the instruction in the present case. In that case the trial court dwelt upon the matter at some length and in the course of a long instruction told the jury, among other things:

"That they should listen with a *disposition to be convinced* by each other's arguments. * * A proper regard to the judgment of other men will often greatly aid us in forming our own judgments. In many of the relations of life it becomes a duty to *conform to the opinion of others,* when it can be done without a sacrifice of conscientious convictions. More especially is this a duty when we are called to act with others, and when dissent on our part may defeat and materially affect the rights of third parties. The single object to be effected is to arrive at a true verdict, and this can only be done by deliberation, mutual concessions, *and a due deference to the opinions of each other.* * * Without that, the trial by jury, instead of being an assistance or essential aid in the administration of justice, would become a most effectual obstacle to it."

It is easy to see that the instruction in that case was far more extreme, and went far beyond the very moderate instruction given by the court in this case. The opinion in the Ivanhoe case does not, in any way, overrule the previous opinions in the Saunders and Hawkins cases, already quoted from. On the contrary, it distinguishes from them upon the ground that in the Ivanhoe case the jury had been out a

long time and had come in and reported that they could not agree.

There may be a question as to whether the attempted distinction between the Ivanhoe case and the previous cases was well based, but whether there was such a logical distinction for the Ivanhoe case upon that ground, or not, it is perfectly plain that there is no such distinction between the case now at bar and those of *State* v. *Saunders* and *State* v. *Hawkins.* Here the jury had not failed to agree. On the contrary, they came in for further instruction in relation to self-defense, from which it must be inferred that they were still considering the matter with the view of an agreement. There surely can be no logical distinction between such an instruction, given at this time, and the same instruction, if it had been given before the jury went out at all. The case at bar is clearly distinguished in this regard from the Ivanhoe case and is exactly on all-fours in principle with the previous cases. It is very doubtful if this question is properly presented by any exception, and it certainly is not specifically pointed out in the assignments of error; but in any event, there was, it seems to me, no error in the action of the court in this regard.

16. Defendant's seventeenth assignment of error refers to the following instruction:

"The law regards human life as the most sacred of all interests committed to its protection, and there can be no setting up of self-defense, unless the necessity of taking human life is actual, present, urgent, unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life or his person from deadly harm or severe calamity felonious in its character, or from all of the circumstances he had reasonable ground

to believe his life or person was in such grave danger.''

It will be noticed that this instruction does not make it necessary for the defendant to have been in *actual* danger, but clearly points out to the jury that he had a right to act on the appearance of danger as presented by the circumstances. It is strenuously urged, however, that that part of the instruction which requires the injury to be ''felonious in its character'' is erroneous in the use of the word ''felonious.'' It is plain that the court used the word ''felonious'' in this connection as synonymous with ''great bodily injury.'' I think, under our statute, the use of the word ''felonious'' was not error.

Independent of our statute the court had high authority for the instruction. In the case of *Commonwealth* v. *Selfridge* (Selfridge's Trial, p. 160), in the Supreme Court of Massachusetts, which seems to have been tried before the full court of that state, Chief Justice PARSONS, in charging the grand jury, said:

''But if the party killing had reasonable ground for believing that the person slain had a *felonious design* against him, although it should appear afterward that there was no such design, it will not be murder but will be either manslaughter or excusable homicide, according to the degree of caution used and the probable grounds of such belief.''

And Mr. Justice PARKER, in charging the trial jury, said:

''When, from the nature of the attack, there is reasonable ground to believe that there is a design to destroy his life, or commit *any felony* upon his person, the killing of the assailant will be excusable homicide.''

. In another leading case, *United States* v. *Wiltberger*, 3 Wash. C. C. 515 (Fed. Cas. No. 16,738), before Judges WASHINGTON and PETERS, Judge WASHINGTON, then an Associate Justice of the Supreme Court of the United States, charged the jury as follows:

"As to this, the law is that a man may oppose force to force in defense of his person, his family or property against one who manifestly endeavors by surprise or violence to commit a felony, as murder, robbery or the like. In this definition of justifiable homicide the following particulars are to be attended to; the intent must be *to commit a felony.* If it would be only to commit a trespass as to beat the party, it would not justify the killing of the aggressor."

The charge of Mr. Justice PARKER in the Selfridge case was quoted with approval by the Supreme Court of Michigan in *People* v. *John Doe,* 1 Mich. 451.

In *Brownell* v. *People,* 38 Mich. 732, Chief Justice CAMPBELL, delivering the opinion of the court, said:

"Any serious bodily harm apprehended from a *felonious* attack—such as mayhem, for example— would not merely excuse but justify extreme resistance."

In another leading case of *State* v. *Kennedy,* 20 Iowa, 569, Judge DILLON, one of the greatest judges, unquestionably, who ever sat upon the Iowa bench, said:

"And unless there be a plain manifestation *of a felonious intent,* no assault will justify killing the assailant."

In the previous Iowa case of *State* v. *Thompson,* 9 Iowa, 188, it was said by Judge STOCKTON:

"If it is not apparent from the manner of the assault, the nature of the weapon used, and the like, *that the assailant intended to commit a felony,* that the danger was imminent, and that the species of resistance used was necessary to avert it, the party assailed is not justified in resorting to the use of a deadly weapon and using it in a deadly manner."

In *State* v. *Harris,* 46 N. C. 190, the court below had charged the jury:

"That whenever there are reasonable grounds to believe there is a design to destroy life or to rob or to *commit a felony* the killing of the assailant will be justifiable."

And the Supreme Court affirmed the judgment, saying:

"We see no error in these directions."

In *Johnson* v. *State,* 136 Ga. 804 (72 S. E. 233), the court below had charged the jury:

"One would not be justified under the law of self-defense in killing another, to prevent the commission of an injury upon him which would amount to nothing more than a misdemeanor."

And the court held that this instruction was not erroneous.

In *Territory* v. *Baker* (Johns.), 4 N. M. 117, 128 (13 Pac. 30, 41), the court said:

"The phrase, 'great personal injury,' as used in the statute, means something more than apprehension, however imminent, of a mere battery, not amounting to a felony. In order to justify the assault, and to slay an assailant, within the meaning of this section, there must be an apparent design on the part of such assailant to either take the life of the person assailed, or the infliction of some great personal injury, amounting to a felony, if carried out; and, in addition thereto, there must be imminent danger of such design being accomplished."

In *Acers* v. *United States,* 164 U. S. 388 (41 L. Ed. 481, 17 Sup. Ct. Rep. 91, see, also, Rose's U. S. Notes), the court below had charged:

That in order to justify a killing in self-defense, the sudden injury must have been

"a great injury to the person injured that would maim him, or that would be permanent in its character, or that might produce death. * * That there was danger to his life or of deadly violence to his person, and unless that condition existed then there is no ground upon which this proposition can stand."

The court held that there was no error.

Careful research by the members of this court, assisted by the briefs of learned counsel for the defendant, has discovered four cases which are claimed to be to the contrary, namely: *State* v. *Keasling,* 74 Iowa, 528 (38 N. W. 397), *State* v. *Clark,* 134 N. C. 698 (47 S. E. 36), *Rogers* v. *State,* 60 Ark. 76 (29 S. W. 894, 46 Am. St. Rep. 154, 31 L. R. A. 465), and *State* v. *Sloan,* 22 Mont. 293 (56 Pac. 364).

The Iowa case cited does not seem to me to be at all in point. In that case the court had charged the jury that the sudden danger must be *actual* rather than *apparent,* and it was upon that ground that the court reversed the judgment of the court below, and not upon the ground that the instruction required the assault to be felonious in its character, in order to justify the killing. The law in Iowa is well established that the assault, in order to justify killing in self-defense, must have been felonious: *State* v. *Thompson,* 9 Iowa, 188, and *State* v. *Kennedy,* 20 Iowa, 569.

It will appear from the consideration of the above decisions that the overwhelming weight of authority is to the effect that, independent of statutory provi-

sions, an assault must be felonious in its character in order to justify a killing in self-defense. But we are not compelled to depend on the weight of authority at common law, for it seems that our statute and our decisions definitely and certainly settle the matter beyond controversy.

Section 1909 of the present Code was originally enacted as part of the Code adopted in 1864 and was Section 518 of that Code. It provides:

"The killing of a human being is also justifiable when committed by any person as follows: (1) To prevent the commission of a felony upon such person or upon his or her husband, wife, parent, child, master, mistress or servant."

This is the only section of the Code which gives any definition of justifiable homicide, which could possibly cover a case like the present one. Section 1910 of the Code provides for "excusable homicide." But no part of its definition has anything to do with a homicide in self-defense. Section 1902, L. O. L., being Section 511 of the Code of 1864, provides that—

"Every other killing of a human being by the act, procurement, or culpable negligence of another, when such killing is not murder in the first or second degree, or is not justifiable or excusable, *as provided in this chapter,* shall be deemed manslaughter."

It is clear, then, that the legislature intended to permit the justification of a killing in self-defense, only in cases where it was necessary to prevent *the commission of an apparent felony.*

Section 1914 of the Code, which was Section 523 of the Code of 1864, and which was adopted at the same time as the sections already referred to, provides:

"If any person shall purposely and maliciously, or in the commission or attempt to commit a felony, cut or tear out or disable the tongue, put out or destroy the eye, cut or slit or tear off an ear, cut or slit or mutilate the nose or lip, or cut off or disable the limb or member of another, such person, upon conviction thereof, shall be punished by imprisonment in the penitentiary for not less than one nor more than twenty years."

It seems to me very clear that this section was intended to cover every case of *great bodily harm,* which would justify a killing in self-defense at the common law, and to make every such willful injury a felony.

Section 1371 of the Code, which was adopted by the same legislature at the same time and as a part of the same act, as these other sections, and which was Section 3 of the act of 1864, provides:

"A felony is a crime which is punishable with death, or *by imprisonment in the penitentiary* of this state."

It seems to me it is very clear that when these sections are construed together, any of the acts which would have been great bodily harm, under the definitions of the common law, are made mayhem and a felony under these statutes, and that, therefore, any of these things, and no others (except danger of death) would justify a killing in self-defense under our Code.

Section 1909 of our Code has been so construed by this court in at least four different cases, which must all be overturned in order to hold that any other assault, except a felonious one, would justify the taking of human life.

The charge complained of in this case was taken almost bodily from *State* v. *Hawkins,* 18 Or. 476, 487 (23 Pac. 475, 479), in which the court quotes the

language complained of with approval, from *State* v. *Neeley,* 20 Iowa, 108.

"The law regards human life as the most sacred of all interests committed to its protection, and there can be no successful setting up of self-defense unless the necessity of taking life is actual, present, urgent; unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life or his person from dreadful harm or severe calamity *felonious in its character."*

In *State* v. *Olds,* 19 Or. 397, 431 (24 Pac. 394, 403), Chief Justice THAYER, delivering the opinion of the court, said:

"The right, either of the state or an individual, to take human life, must be sanctioned by law. In the latter case it must appear that it was done to *prevent the commission of a felony* upon the individual, etc., as provided in Section 1730 of the Code."

In *State* v. *Smith,* 43 Or. 109, 117 (71 Pac. 973, 976), Mr. Chief Justice MOORE, delivering the opinion of the court, said:

"Before one can excuse his conduct in taking the life of another it must appear that it was done to prevent the apparent commission of a felony by the latter upon him."

In *State* v. *Doherty,* 52 Or. 591, 596 (98 Pac. 152, 154), Chief Justice Robert S. BEAN, delivering the opinion of the court, said:

"Fear of a slight injury is not sufficient, nor will a mere assault, not felonious, furnish an excuse for the taking of life. If the intention of the assailant is only to commit a trespass or simple beating, it will not justify his killing. * * But, considering the relative age and strength of the parties or the ferocity of the attack, if the intended beating is of such a character as to endanger life or limb, *then it will be felonious,* and the assaulted person is justified in

taking the life of the assailant if necessary to preserve his own or protect him from such a beating.''

The decisions of this court should, it seems to me, be like a steady light set in a high place to chart and direct the course which the lower courts can safely follow.

That the Circuit Courts have generally followed these decisions, strikingly appears, from the fact that practically the same instruction is now before us from the courts of two different jurisdictions in sections of the state remote from each other.

It is urged that there are cases, as in the instance of an assault by an insane person, or two persons out upon a plank in midocean, which will not hold them both, when a person would be justified in taking life to preserve his own, even although there was no felony intended or apparently intended. It seems enough to say that no such case is presented here, and there is no contention that any such facts existed. It will be soon enough to decide upon such remote contingencies, when some such case actually occurs. In view of the recklessness of some people in the matter of human life, it may be doubtful whether it would be good policy for the legislature to say in advance, that the killing of another human being should go entirely unpunished even under such circumstances.

An indeterminate penalty with a minimum of only one year's imprisonment for manslaughter is within the discretion of the trial judge, who hears all the evidence and knows all the facts, and who may be trusted to do as near as he can, what is justice in the cause. In addition to this, the law has provided the pardoning power in the Governor in extreme cases, where even the penalty of one year's im-

prisonment for the taking of human life might be harsh and unjust. But whether or not there may be cases in which the court would be justified in stretching the law, or legislating an exception which does not exist, it is plain there was no such case here.

Notwithstanding its statutory correctness and the eminent authority for the same, we do not think the use of the word "felonious" is to be recommended in instructions of this kind. It is more or less technical in its meaning and may possibly be misunderstood and be confusing to the jury. Here, however, there was no request for further explanation or definition of the word, and indeed the defendant in his own requests for instructions used the same term in a similar connection. In the thirteenth instruction the defendant asked the court to tell the jury:

"Any serious bodily harm apprehended from a *felonious attack* did not merely excuse but would justify extreme necessity."

And again in the fourteenth request the court was asked by the defendant to say to the jury:

"If then you should find in the consideration of this case that the defendant honestly believed that he was being *feloniously assaulted,* or had reasonable cause to believe or did believe he was in danger of death or great bodily harm, he would be justified in defending himself even to the extent of taking the life of his adversary."

The assault upon the defendant in this case, if there was one at all, was with a loaded pistol and was of course deadly in its character. It was for the jury to decide whether or not the deceased made the first assault, as claimed by the defendant, and whether or not defendant afterward fired the fatal shot when it was unnecessary to protect himself.

The question as to this instruction is really purely academic in this particular case.

When there has been generally a fair trial it seems to me we should not be too ready to reverse a case on account of trifling matters. The lower courts have much to contend with and if we review their actions captiously and hypercritically, their judgments in any trials will seldom stand. The aim of the criminal law is not so much to punish the particular offenders, as it is to furnish a just example which will prevent others from committing crime. This is especially true in the matter of murder and felonious homicide. In such cases it is as essential that prompt justice should be done as that justice should be done at all. Every reversal, after there has been a fair trial, tends to dull the edge of justice and discourage its officers in the attempt to enforce the law. At the same time it encourages reckless and evil-disposed persons to a disregard of the sacredness of human life, and to believe that they can carve and shoot each other, upon small provocation, and safely trust to the postponement and evasion of any penalty. No innocent man should be permitted to suffer or be judged without a fair trial; but, on the other hand, no guilty one should be permitted to escape or postpone the penalty of his misdeeds upon any trifling cause.

17. Complaint is made of the conduct of the district attorney and it is claimed that, in his argument to the jury, he used the following language:

"You can't get away from the fact that Bill Butler shot that boy in cold blood. The fact that he was down in the other end with a Winchester—a fact asserted by Dutton and Jackson."

Dutton and Jackson testified, as we have already seen, that they found a man at the west fence, and

that he was behind the fence with a gun, which he
pointed at each of them in turn, and they described
as nearly as they could observe in the dim light, the
clothes he wore and the gun which was pointed at
them over the fence; and the clothes and gun which
were concededly worn and used by the defendant on
that night had been described to the jury for com-
parison. Dutton and Jackson, however, did not di-
rectly identify the defendant as the man they saw
behind the fence, and it is therefore claimed the
statement of the district attorney, that the defend-
ant was down at the other end with a Winchester
"a fact asserted by Dutton and Jackson" was a
misstatement and that the court below erred in not
sustaining defendant's objections and motion in re-
lation thereto. It seems doubtful if this question
is presented in such a way as to enable us to pass
upon it here. The bill of exceptions signed by the
judge shows no such occurrence and the original
transcript, certified to by the official stenographer,
is as follows:

"Mr. Roberts made the statement that Bill Butler
was at the west end of the field.

"By Mr. Boggs: Defendant objects on the ground
that it is incompetent, irrelevant and immaterial and
not evidence."

"By the Court: 'Gentlemen of the Jury, you are
the exclusive judges of the evidence, and you will
remember what the evidence was in that respect,
and will consider what evidence was given and what
wasn't."

Certain affidavits were filed on behalf of the de-
fendant, asserting that the district attorney did
make the statement complained of by defendant, and
alleging that the attorney for defendant did make
objection to the language and to the proceedings

thereon; and it is claimed that these affidavits are sufficient to present the matter to this court under Section 170 of the Code. The affidavits presented are those of the attorney for the defendant, Grace Taylor, a stenographer, and one Olga Beiberstadt. The stenographer was not the official court reporter appointed by the court, but a stenographer employed by the defendant. There is no evidence that she was a "competent" stenographer, and indeed the report of the argument of the district attorney is so fragmentary, that it seems plain she did not get anything like a complete report of the same. The certificate of the clerk is the only evidence that any of these affiants were disinterested. He certified that the stenographer was a respectable and disinterested party, "unless the fact of her being employed by the defendant's counsel would make her an interested party." It does not appear whether she was in the general employ of the defendant's attorney or only employed in that particular matter. The certificate of the clerk as to Olga Beiberstadt is as follows:

"I believe the affiant to be a respectable party, but *I do not wish to certify that affiant is disinterested* for the reason that she and the other members of the family have followed the case quite closely and they were called as witnesses."

It appears from the record that three of the Beiberstadt family were witnesses for the defendant in the cause. They were the nearest neighbors of the defendant, and evidently on very friendly terms. It was to the Beiberstadt home that the defendant went after the shooting, and where he remained until the arrival of the sheriff. It is apparent from the record that there was ample reason for the clerk to

hesitate in certifying that Olga Beiberstadt was a disinterested party. It may also be considered as doubtful whether the stenographer who was in the employ of the defendant in this particular matter was disinterested within the meaning of the law. Again, Section 170, L. O. L., also provides:

"Such statement must be filed within ten days of the time that the objection is made, if the court at the time the objection is made refuses the exception; and if the disagreement does not arise until the time of the settling of the bill of exceptions, then the said statement may be made and filed within ten days of that time and not otherwise."

There is no showing as to when the controversy arose (if there was a controversy) between the court and the attorneys for the defendant as to what took place, and no showing as to whether or not the affidavits were filed within ten days after the controversy arose. It appears from the record that the cause was tried in February, 1918. The bill of exceptions, however, was not settled until August 10th of the same year. The affidavit of the defendant's attorney, and that of Grace Taylor, the stenographer, was sworn to on the ninth day of August, so that the controversy must have arisen, at some time prior to the settling of the bill of exceptions, but as to whether it occurred at the trial, or at some time between the trial and the settling of the bill of exceptions, does not appear. The affidavit of Olga Beiberstadt was not filed until August 17th. It seems impossible to say from the record whether the affidavits were filed within the time required by the statute or not. If they were not, of course they cannot be considered by this court.

If we should conclude that the record was in such shape as to present the question to the court at all,

we should then have to pass upon the question of fact, as to whether or not the affidavit of these more or less interested parties—the attorney for the defendant—the stenographer for the defendant, and Olga Beiberstadt, a possible partisan of the defendant—overcome the showing made by the bill of exceptions, made and certified to by the judge who tried the cause and the official transcript of the official stenographer, certifying as to what took place at the time of the alleged occurrence. Even if the affidavits prevailed over the certificate of the judge and of the official stenographer as to the facts, there would still be a question as to whether upon defendant's own showing any exception as to the alleged misstatement of the district attorney was properly and tangibly presented to the trial court. Section 170, L. O. L., provides:

"The point of the exception shall be particularly stated."

The statement of the district attorney now complained of is, that the alleged fact that the defendant was at the west side of the fence was "asserted by Dutton and Jackson." According to the affidavit the objection of the defendant's attorney in the court below was as follows:

"If your honor please, defendant objects to the argument of the district attorney. Neither Dutton or Jackson testified that defendant was at the west side of his field that night. The fact that defendant did not testify while on the witness stand that he was not at the west side of his field that night is not an admission that he was there. *There was no evidence that defendant pulled a gun on Dutton or Jackson.* I object to all the argument of the district attorney, and ask the court to instruct the jury to disregard same, and that defendant did not admit

that he was at the west side of the field that night, and *that there was no evidence that defendant pulled a gun on Dutton or Jackson,* and that neither Dutton or Jackson testified that defendant was at the west side of his fence that night."

There is so much in the objection and motion, even according to the claim of defendant, and the matters complained of are so blended and confused, that it would have been very difficult, if not impossible, for the court below to have disentangled the good from the bad. It is perfectly apparent that the objection and motion could not have been sustained as a whole. The exception, if there was any, was to the ruling of the court upon the motion as a whole, and otherwise no particular point was presented, as required by the statute. But assuming (but not deciding) that the affidavits were filed in time—that they were sufficient to present the question to the court and that these affidavits prevail over the certificate of the trial judge and the official stenographer; and assuming, further, that the defendant had complied with the law in pointing out the particular point of his objection; we are still of the opinion that there was no such error as would justify a reversal of the cause. It seems to us that the assumption by the district attorney that the witnesses Dutton and Jackson had identified the defendant was more in the nature of a misconstruction of the testimony than a positive and willful misstatement.

The witnesses, Dutton and Jackson, had stated that they saw someone at the west side of the field, and that that person had pointed a gun at them over the fence, as stated by the district attorney, and they had described that person, his clothes, and his gun as nearly as they could on account of the semi-darkness and excitement. From the description of

96 Or.—17

the clothes and the gun and the circumstances and the fact that the defendant admitted he was up there at the field with a gun that night, the district attorney jumped to the conclusion that the person Jackson and Dutton saw at the west side was the defendant, and generalized the whole matter by stating that they saw the defendant up there. It would be going much too far, it seems, to hold that such a too-strong construction of the testimony, by an attorney in the heat of argument, is sufficient cause for the reversal of a case.

The court below submitted the whole matter to the jury who were really the final arbiters, as to what the testimony really was. The judge, in effect, told them to disregard the statements of the district attorney if they were not sustained by the evidence. No court can be expected to hold every detail of the testimony in a long case in his mind, so that he can say upon the spur of the moment exactly what the testimony was. And he ought not to be required upon a general objection like this, covering a number of different points, to stop the proceedings of the trial and go through a long record from start to finish to ascertain just what was the exact testimony as to each of the different matters covered by the motion. It goes without saying that every attorney should keep within the evidence and if he willfully makes a misstatement as to the testimony upon an important matter, it may be sufficient cause for a reversal. We do not think such a result would be justified from the circumstances in this case.

There are some other minor claims of error, to which we have not specifically referred, but all of which we have carefully considered, and we think the rulings of the court thereon were not erroneous.

Upon the whole the defendant seems to have had a fair trial and the court below seems to have striven to preserve and secure for him all of his rights. Many of the rulings of the court were more favorable to the defendant perhaps than the law would justify.

The judgment is affirmed.

AFFIRMED.  REHEARING DENIED.

HARRIS, J., Concurring Specially.—I concur in the conclusion of Mr. Justice BENNETT that the defendant was not prejudiced by the instruction referred to in the seventeenth assignment of error. The question as to whether or not the right of self-defense is available only when necessary to avert a felony, actual or apparent, is, on the record presented here, purely academic; and the decision of that question is entirely unnecessary for the disposition of this appeal. Assuming that McDonald Stewart fired at the defendant, then it is certain that he did so either in self-defense or else his conduct amounted to an actual or apparent felonious assault upon the defendant; and therefore the instruction was not prejudicial to the rights of the defendant even though it is assumed that a person can slay an assailant in order to prevent bodily harm not amounting to a felony: *Mitchell* v. *State,* 38 Tex. Cr. Rep. 170, 192 (41 S. W. 816); *Curtis* v. *State* (Tex. Cr. App.), 59 S. W. 263; *Bryant* v. *State* (Tex. Cr. App.), 47 S. W. 373; *Matthews* v. *State,* 42 Tex. Cr. Rep. 31 (58 S. W. 86); *Evans* v. *State,* 120 Ala. 269, 274 (25 South. 175).

I express no opinion as to whether or not the right of self-defense exists only in order to prevent felonies regardless of the degree and extent of the bodily harm actually or apparently about to be done to the

slayer; and I withhold any expression of opinion
upon that subject until a case is presented requiring
a decision of the question.

While the language used by the court when ad-
dressing the jury about reaching an agreement might
in some cases be harmful and for that reason ought
not to be followed as a model, yet, for the reasons
pointed out by Mr. Justice BENNETT I am entirely
satisfied that the defendant was not prejudiced at
all. It is always - dangerous, in the view of the
writer, for the trial judge to attempt to urge upon
the jury the importance of an agreement. No per-
son realizes any more than does a juror that it is
important that the jurors agree. Whenever the trial
judge does enter into the subject at all there is
always an accompanying risk, unless great care is
used, of saying something which might be harmful
to one of the parties.

I concur with Mr. Justice BENNETT in both the rea-
soning employed by him and the conclusions reached
by him concerning the remaining assignments of
error. The judgment should be affirmed.

JOHNS, J., concurs.

BURNETT, J., Dissenting.—The defendant was
indicted for murder in the second degree, committed
by killing Joseph McDonald Stewart. The homicide
involved seemed to have resulted from a dispute
about laying out a county road through the land
of the defendant. The highway in question ran
through the defendant's premises from west to
east. The claim of the prosecution is that some-
one had been laying up a rail fence across the
supposed road on the east and west boundaries of
the defendant's land. It is in evidence that the road

supervisor had thrown down the fence several times; that each time it was put up, again, and that on the evening in question, October 29, 1917, the friends of the road, including the supervisor, had arranged to watch the gaps in the fence on each side of the defendant's land in order to identify the party who closed them. Two men, Dutton and Jackson, accompanied by the wife of the latter, went in an automobile to a point about 400 steps from the west gap, where the men left the car and went toward the opening in the fence where the road went through. As they approached, they saw someone laying up the rails. They then returned to the car and drove it up to a point near the gap, where the two men got out and advanced through the gap and along the fence inside the defendant's inclosure, away from the disputed road, when they saw a dark object farther down the fence. As they approached, it proved to be a man, who pointed a gun first at Dutton and then at Jackson. They both retreated and left in the automobile. Neither of them was able to identify the man they saw.

Soon after this the decedent was killed at a point about 119 feet outside of the defendant's premises on the east side, measured from the opening in the fence at that point. The evidence tends to show that the decedent was concealed behind a tree. Pursuant to the arrangement he had gone there to watch the gap in the fence. It was expected that a man named Patrick would accompany him, but for some reason Patrick could not be present and the decedent was there alone. He was armed with a pistol. There were powder-marks on the tree, as if a shot had been fired from behind it toward the fence. A pistol bullet was found in one of the fence rails south of the gap, as if fired from the direction of

the tree behind which the decedent was concealed. Substantially, the defendant's version of the affray was that he was walking along the east line inside his premises from the north to the south and had got a little south of the line of the road when someone fired two shots toward him from the direction of this tree. He then raised his gun quickly and fired two shots, and moved a few feet farther south along the fence, when a third shot came from the direction of the tree and struck the rail near him. He says that he took a few steps farther south, got down behind the fence, pointed his gun through the fence and fired a shot at a dark object alongside of the tree, when the decedent fell and "hollered," and the defendant got up and left the scene.

The jury retired about 4 o'clock in the afternoon and at 11:25 that night it returned for further instructions on self-defense and some of the testimony was read to it at its request by the official reporter. Among the instructions given to the jury before it retired, and repeated when it returned, was the following:

"The law regards human life as the most sacred of all interests committed to its protection, and there can be no setting up of self-defense, unless the necessity of taking human life is actual, present, urgent, unless, in a word, the taking of his adversary's life is the only reasonable resort of the party to save his own life or his person from deadly harm or severe calamity felonious in its character, or from all of the circumstances he had reasonable ground to believe his life or person was in such grave danger."

This instruction was erroneous, among other things in that it required the danger to be one of deadly or fatal harm or felonious in its character. A man's life may be endangered by an act not felo-

nious in its nature. It is not essential that his assailant be or appear to be in the act of committing a felony upon him. If the conduct of his assailant either actually or apparently puts the defendant in imminent danger of death or great bodily harm, it is no concern of his with what intent the assailant is acting. For instance, an insane person is incapable of committing a felony, being unable to form a felonious intent; yet one attacked by such a demented person would have the right in the presence of real or apparent danger of death or great bodily harm at his hands, to kill the assailant in self-defense if necessary to repel the attack. In case of common calamity where there is a question of which of two persons shall survive, it is not felony for either to preserve his own life by sacrificing that of the other, as, for instance, in shipwreck where the only plank will support but one person and two struggle for it, either has the right to defend his own life by killing the other, although there is no felony present in the transaction. One would have a right to defend himself even against a child armed with a pistol and about to shoot him.

In *State* v. *Keasling*, 74 Iowa, 528 (38 N. W. 397), substantially the same instruction was given that is here under consideration, and the court said that it was erroneous, specifying that:

"Under it the right to take life or to resort to the use of a deadly weapon in the resistance of an assault is made to depend on whether the assault is in fact felonious, and the danger actual and urgent."

In *State* v. *Clark*, 134 N. C. 698 (47 S. E. 36), practically the same question was before the court. The decedent had attacked one Miller with a knife. The defendant interposed, when the decedent turned

upon him. The court thus instructed the jury, modifying the request of the defendant as noted in brackets below:

"If the jury believe from the evidence that the deceased was engaged in a difficulty with Asa Miller and was attempting to cut said Miller with his knife in the presence of the defendant [and the deceased was then capable of executing such a purpose], it was his duty to endeavor to suppress and prevent the same, and if in attempting to do so the deceased left off his difficulty with Miller and made upon the defendant with a drawn knife in such manner as to cause the defendant to [reasonably] apprehend, and he did [actually] apprehend, that he was about to be slain, or to receive enormous bodily harm, then the defendant had a right to stand his ground and, if necessary, to take the life of the deceased without retreating [provided the assault made upon the defendant was felonious or with felonious intent]."

After various other adverse comments upon the proviso in the last clause, the court said:

"But the addition to the defendant's prayer for instructions was in itself erroneous. It was not necessary that the assault upon the defendant should have been felonious or committed with a felonious intent."

In *McKinney* v. *Commonwealth*, 26 Ky. Law Rep. 565 (82 S. W. 263), the trial judge had instructed the jury that, "One may lawfully defend his home from the willful assault of another." The plain effect of the word "willful" in this excerpt was to bind the defendant by the intent with which the decedent acted, and not to allow the defendant to rely upon the decedent's act without reference to his intent. In other words, when worked out to its logical analysis, the teaching of the instruction was that before a defendant may slay his antagonist, the lat-

ter must not only have done or be about to do a
wrongful act to the defendant capable of producing
his death or great bodily harm, but must also dis-
close a criminal intent coupled with the act so as to
make it amount to a felony. Here follows the com-
mentary of the Kentucky Court of Appeals, speak-
ing by Mr. Justice O'REAR:

"It was not incumbent upon one so assaulted to
ascertain whether the assault was willful or not be-
fore he could lawfully exercise his right of self-
defense or of protecting his family. The fact that
the assault was violent, or reasonably appeared to
put him or some member of his family in danger of
losing his life or of great bodily harm, raised his
right to defend himself or those of his home from
the real or apparent danger. The word 'willful'
should have been omitted from the clause quoted."

*State* v. *Robinson,* 143 La. 543 (78 South. 933),
was a homicide case in which the jury was instructed
thus:

"Before such a person as I have described can
reasonably and honestly entertain this apprehension
of danger to his life, or great bodily harm, there
must be what the law calls an 'overt act, amounting
to a felonious assault,' on the part of the person
killed, directed against the body of the person doing
the killing."

Ruling on this instruction adversely, the Supreme
Court of Louisiana adopted as its own the argument
of the defendant's counsel as follows:

"Under the decisions it was not necessary for the
overt act to amount to a felonious assault. For
there to be a felonious assault, the person perpetrat-
ing it must have intended a felony, while it is the
law that he may have intended no harm at all. It is
not what the person assaulting, or apparently as-
saulting, intends that controls, but what the act he
does, taken in consideration with facts which had
preceded, caused the defendant to believe deceased

intended, and which gave him the right to so believe, that controls. It might well be that deceased committed no assault at all, and that he did not intend to commit any, and yet such facts could exist as would give the defendant the right to have taken his life.

"In the case of *State* v. *Rideau,* 116 La. 247 (40 South. 691), an uncle had threatened the life of his nephew the day before. The next morning he entered the bedroom of his nephew, who, without a word, shot him as he entered. Defendant offered to prove the desperate character of his uncle and previous threats, but these were excluded on the ground that there was no overt act. This court said entering another man's sleeping-room may be a friendly or a deadly act according to circumstances.

"Referring to his entering the room the court said, 'We think it was a hostile demonstration.' Deceased had a trunk in the room, and it could have been that he was entering to get something out of the trunk. But the intention of the deceased is not the test. The test is what the defendant believed, and what the act of deceased gave him to believe."

The following cases are instructive in consideration of the principle that the real or apparent danger which a defendant may resist even unto the death of his antagonist, if reasonably necessary, or apparently so, need not in all cases amount to a felony: *State* v. *Sloan,* 22 Mont. 293 (56 Pac. 364); *Ritchey* v. *People,* 23 Colo. 314 (47 Pac. 272, 384); *Rogers* v. *State,* 60 Ark. 76 (29 S. W. 894, 46 Am. St. Rep. 154, 31 L. R. A. 465); *State* v. *Bowling,* 3 Tenn. Cas. 110; *State* v. *Bartlett,* 170 Mo. 658 (71 S. W. 148, 59 L. R. A. 756); *State* v. *Gray,* 43 Or. 446 (74 Pac. 927); *Hill* v. *State,* 94 Miss. 391 (49 South. 145).

The jury might well have believed from the instruction under consideration in the instant case that

before acquitting the defendant it was necessary to impute to the decedent the actual or apparent purpose to commit a felony, as distinguished from a mere misdemeanor, whereas the defendant is not to be bound by the intent of' the deceased necessary to constitute a felony. He is entitled to defend himself against real or apparent danger of death or great bodily harm, whether it amounts to felony or not, and irrespective of whether or not his assailant has a felonious intent. The instruction was intrinsically erroneous in these respects.

Neither can the question properly or justly be ignored as academic. We have no right to assume as a fact the restrictive alternative that the decedent either fired in self-defense or as an assault upon the defendant, being armed with a dangerous weapon. It is possible that his design was only to frighten the defendant, which would not be felonious. At any rate, the jury could put that construction on his wild shooting and the defendant is entitled to it as constituting reasonable ground for believing himself in danger of death or great bodily harm within the illustration given in the Selfridge case: 1 Horrigan & Thompson's Cases of Self-defense, 1.

After having repeated the charge in question, taken from the original instructions, the court then addressed the jurors as follows, before they were permitted to retire the second time:

"Now, gentlemen, I have read to you the instructions on self-defense as I gave them to you at the time I instructed you before and I think I have covered all of the instructions upon self-defense.

"Now, when you go back I want you to do the best you can to harmonize your differences, and everybody remember that it must be a very severe strain upon a defendant to go through an ordeal of this kind, and he is entitled to a verdict, whatever it

shall be, and it is also important that the state shall have a verdict as we will have to try the case over again if we do not get a verdict, and I want you to try it over again, and I want you to try not to lose your tempers and try your best to harmonize· your differences and everybody try to do right and to do what your consciences think should be done but do not get stubborn and say you won't. Sometimes jurors get tired and I know it is hard to ask jurors to do this work, but some jury will have to solve this and so I will ask you to do the best that you can to solve it. You may now retire with the bailiffs.''

The counsel for the defendant then and there excepted to the language of the court. The jury very soon afterward returned a verdict of guilty of manslaughter and recommended ''leniency of the court.''

In the case of *State* v. *Ivanhoe*, 35 Or. 150 (57 Pac. 317), the jury, having been in consultation all night, was sent for and reported that it could not agree upon a verdict. The court sent it out again after addressing it as follows:

''The court will call the attention of the jury to the fact that this is a case of some importance. There has been a great deal of time taken up, and the case will have to be decided by some jury selected the same way you have been selected, and hear the same evidence, practically, you have heard. And, if another should disagree, it would have to be tried again, until a jury agreed, and it is not reasonable to suppose that another jury could arrive at a verdict in the case any better than you can. It is your duty to agree, if you conscientiously·can do so. You should pay proper respect to the opinions of each other, and listen with a disposition to be convinced by each other's arguments. In this manner you may be able to determine whether any opinion you now hold is justified by the evidence. A proper

regard to the judgment of other men will often greatly aid us in forming our own judgments. In many of the relations of life, it becomes a duty to conform to the opinions of others, when it can be done without a sacrifice of conscientious convictions. More especially is this a duty when we are called to act with others, and when dissent on our part may defeat and materially affect the rights of third parties. The single object to be effected is to arrive at a true verdict, and this can only be done by deliberation, mutual concessions, and a due deference to the opinions of each other. By such means, and such means only, in a body where unanimity is required, can safe and just results be attained; and, without that, the trial by jury, instead of being an assistance or essential aid in the administration of justice, would become a most effectual obstacle to it. Jurors should carefully and patiently canvass all the evidence with an honest and conscientious effort to reconcile any differences of opinion they may entertain of the truth of the matter in issue. Of course, at last, each juror must act on his own judgment—the verdict must eventually be his own verdict; and I would not by these instructions at all urge any juror to violate his conscience, or to agree to a verdict other than he eventually believes to be the result of the evidence, beyond a reasonable doubt. I speak of these matters to you on account of the importance of the jury arriving at a verdict in this case. And, as I have already suggested in this case, I would not instruct any juror to violate his conscience in reaching a verdict; but, in determining whether his convictions are sustained or based exclusively on the evidence, he has a right to consider the opinions of other jurors, and listen to their construction of the evidence, as well as his own, and, if he can then conscientiously acquiesce in a verdict with the other jurors, it is his duty to do so, without violating any conscientious scruples or beliefs he may have in regard to the guilt or innocence of the party accused of the offense.''

The only distinction to be drawn between the language of the two trial judges is that in the instant case the instruction is more condensed. Otherwise the one here under consideration is substantially a miniature replica of the former. In both cases the palpable object of the court was to induce, if not compel, a verdict. The reasoning of Mr. Justice MOORE in the Ivanhoe case leads clearly to the conclusion that such language is reversible error. If it was wrong in the Ivanhoe case, constituting the only error considered by the court, it was wrong in the present instance. If it was right to reverse the Ivanhoe conviction on that ground, by the doctrine of *stare decisis*, if for no other reason, the present conviction should be overthrown. The majority of the court in the recent case of *Olcott* v. *Hoff*, 92 Or. 462 (181 Pac. 466), laid great stress on the duty of the court to be bound by precedent. If we are to regard this latest deliverance of the court as the law, it should be applied in the instance of the present defendant, leading to a reversal of the conviction.

In *State* v. *Bybee*, 17 Kan. 462, the jury had deliberated upon its verdict several hours when it was brought into court and asked if it had agreed upon a verdict. Having answered in the negative, the court harangued it in much the same strain that runs through the present remarks to the jury and those in the Ivanhoe case. The opinion of the court on appeal was delivered by Mr. Justice BREWER, afterward a member of the Supreme Court of the United States. The trial court had urged the jurors to approach the case in a spirit of mutual concession and forbearance and for each to surrender some of his own ideas and opinions to what might seem to be an overwhelming sentiment against him, finally using this illustration:

"You should bring your minds together like the mixing of different ingredients by an apothecary, and ascertain what is the product."

In reversing the case, Mr. Justice BREWER used this language:

"A verdict is the expression of the concurrence of individual judgments, rather than the product of mixed thoughts. It is not the theory of jury trials, that the individual conclusions of the jurors should be added up, the sum divided by twelve, and the quotient declared the verdict, but that from the testimony each individual juror should be led to the same conclusion; and this unanimous conclusion of twelve different minds, is the certainty of fact sought in the law. Especially is this true in criminal trials. Here should no thought of compromise be tolerated. Before the state can fairly demand the conviction and punishment of an alleged criminal, the twelve jurors should each be led from the testimony to a clear conviction of his guilt; and where six jurors believe a defendant guilty of murder, and six believe him innocent of any offense, it is an outrage for the twelve to bring in a compromise verdict of guilty of manslaughter. We fear that something of this kind occurred in this case, and that the charge above quoted was mainly instrumental in producing this result. At any rate, it seems to us clear that such would be the tendency of those instructions; and it is not apparent that it did not have that effect. For this error the judgment must be reversed, and the case remanded with instructions to grant a new trial."

In *State* v. *Fisher,* 23 Mont. 540 (59 Pac. 919), after an extended colloquy between the court and the jurors, respecting the rules governing the jurors in their consideration of the testimony, the court addressed them, calling their attention to the expense of the trial, and said:

"This is a case, gentlemen, that is an expensive case for the county to try, and it is not a case where

I think a jury ought to disagree in. They either ought to find this man guilty of murder in the first degree, or they ought to find him not guilty. Feeling as I do about the matter, I do not see any reason why a jury should disagree in the matter, and put the county to a large expense, although I don't care to force any man against his conscience to agree to a verdict which he does not believe in. Nevertheless, if he can be persuaded by talking with his fellow-jurors as to the guilt or innocence of this defendant, so that they all may agree, I should much prefer it."

The court reversed the case for this language used by the trial judge.

In *State* v. *Place,* 20 S. D. 489 (107 N. W. 829, 11 Ann. Cas. 1129), the utterance of the court to the jury was:

"You will have to agree in this case, for I will keep you together until you do agree."

This, indeed, is stronger language than that being considered in the instant case, and led to a reversal. But the language of the court in its opinion applies even to this case:

"Within the limits allowed by the law the discharge of such duty [that of the jury] is as important and should be as free from coercion as are the duties imposed upon the judge. Neither court nor jury is responsible for the conduct of the other while acting in its own legitimate province."

In *People* v. *Engle,* 118 Mich. 287 (76 N. W. 502), under circumstances similar to those of the present litigation, the court advised the jurors to try to be persuaded instead of trying to persuade their fellows. Within an hour afterward, the jury returned a verdict of guilty, recommending leniency. The conduct of the court was held to be erroneous. See, also, *State* v. *Chambers,* 9 Idaho, 673 (75 Pac. 274),

where the court reminded the jurors of the great expense of the trial, admonished them to meet in a spirit of investigation, to try to get together and not have too much pride in their individual opinions, and the case was reversed because of such remarks, the court citing the Ivanhoe case from the Oregon Reports. Another precedent to the same effect is *State* v. *Shuman,* 106 S. C. 150 (90 S. E. 596).

In addition to its coercive effect upon the jury, the admonition was also erroneous in that, after twice urging the jurors to "harmonize your differences," the judge told them to "do what your consciences think should be done, but do not get stubborn and say you won't."

In *Rugenstein* v. *Ottenheimer,* 70 Or. 600 (140 Pac. 747), the language of the charge was in part as follows:

"Now, gentlemen, take the facts in this case—do what is right between the plaintiff and the defendant here, without regard to anything, except as your own conscience dictates it to you, under the evidence and under the rules of law as I have given them to you."

A judgment for the plaintiff was reversed because of this language, and the precedent has never been questioned since. There, the statement made reference to the law and the evidence as an accompaniment to the dictates of conscience. In the instant case the decision is placed exclusively upon "what your consciences think should be done." The only issue or "difference" to be considered in the deliberations of the jury was the guilt or innocence of the defendant. The jurors' own differences had no place in the matter. With many, if not most, men, conscience is but a euphemism for prejudice and is not the formula for the determination of an issue of fact

96 Or.—18

in judicial proceedings. The law of the land and the evidence constitute the standard by which the accused must be judged and his liberty ought not to be committed to the so-called conscience of his triers. Practically, the court told the jury to return a "general principles" verdict. The direction to harmonize individual differences can mean nothing else than an invitation to a compromise verdict, which Mr. Justice BREWER so properly denounced as an outrage.

Aside from precedent, and on principle, the language of the Circuit Court should lead to a reversal of the case. The statute lays down the limits of the court's duty thus:

"In charging the jury, the court shall state to them all matters of law which it thinks necessary for their information in giving their verdict, but it shall not present the facts of the case, but shall inform the jury that they are the exclusive judges of all questions of fact": Section 139, L. O. L.

It is the exclusive province of the court to declare to the jury the law of the case. The latter's function of declaring the fact after considering the testimony is equally exclusive and the court has no right to say anything to it at any stage of the instructions, much less after its deliberations have begun, calculated to hasten or retard the discharge of its duty. When the judge does so he interferes with the prerogative of the jury in an unwarranted manner. He goes beyond his function of declaring the law and undertakes to influence the declaration of the fact. No principle of law is involved in such a lecture and jurors are not under the tutelage of the judge. Like him, they are for the time being component parts of the tribunal, charged with the execution of the law. Whether or not the jury stated to the court that it was unable to agree does

not affect the principle. What was said in either case had a tendency to force a decision. Coupling an erroneous instruction on self-defense with the address urging the jury to a verdict in the terms stated, followed as it was by what was evidently a compromise verdict, was prejudicial to the defendant.

Another assignment of error is predicated upon alleged misconduct of the district attorney in his argument to the jury. As stated, the court admitted the testimony of two witnesses, Dutton and Jackson, to the effect that the same evening but before the homicide in question, they were on watch near the western boundary of the defendant's land and saw a man laying up some rails across the alleged county road, who disappeared as they drove up in their automobile, and that when they left the car, went inside the Butler premises and proceeded south along the fence, a man rose up from the fence corner and leveled a gun upon them, whereupon they retreated. It will also be recalled that the homicide occurred near the east boundary of the defendant's premises. It is charged that in the argument to the jury the district attorney used this language:

"You can't get away from the fact that Bill Butler shot that boy in cold blood; the fact that he was down in the other end with a Winchester, a fact asserted by Dutton and Jackson."

The defendant claims that his counsel made the following objection at this point:

"If your honor please, defendant objects to the argument of the district attorney. Neither Dutton nor Jackson testified that defendant was at the west side of his field that night. The fact that defendant did not testify while on the witness-stand that he was not at the west side of his field that night is not an admission that he was there. There was no evidence that defendant pulled a gun on Dutton or

Jackson. I object to all the argument of the district attorney and ask the court to instruct the jury to disregard same and that defendant did not admit that he was at the west side of the field that night, and that there was no evidence that defendant pulled a gun on Dutton or Jackson and that neither Dutton nor Jackson testified that defendant was at the west side of his fence that night.''

It is also claimed on the part of the defendant that in ruling upon the objection the court used this language:

''Well, it doesn't make any difference anyway, the jury are half asleep and if you don't find the defendant was down there at the west end of the fence that night, why you won't have to consider it''

—and that the defendant excepted to the ruling at the time. This matter is not in the bill of exceptions signed by the trial judge, but appended thereto is the affidavit of a stenographer who took down the address of the prosecuting attorney, to the effect that the district attorney used the language in question; that the defendant's counsel made the objection stated and that the court made the ruling mentioned, to which the defendant's counsel excepted. The affidavit of defendant's counsel is also appended, to the same effect, and these two are corroborated by the affidavit of a third deponent in substantially the same terms. As to the stenographer, the clerk of the court certifies that he believes her ''to be a competent stenographer and a respectable and disinterested party, unless the fact of being employed by the defendant's attorney would render her an interested party.'' As to the third affiant, the clerk certifies:

''I believe the affiant to be a respectable party. But I do not wish to certify that affiant is disinterested, for the reason that she and the other mem-

bers of the family have followed the case quite closely and they were called as witnesses.''

There are no affidavits in the record in opposition to those already mentioned. Section 170, L. O. L., reads thus:

"The point of exception shall be particularly stated, and may be delivered, in writing, to the judge, or entered in his minutes, or taken down by an official stenographer, or by any competent stenographer, at the time it is made, and at the time or afterwards, be corrected until made conformable to the truth. If an objection is made to any ruling of the court in the progress of a trial, and the truth of the statement thereof is not agreed upon beween the counsel and the court, the counsel may verify his statement thereof by his own oath and that of two respectable and disinterested persons, or by his own oath and that of the stenographer who took the same down, and file the same as an exception to the ruling objected to. Such statement must be filed within ten days of the time that the objection is made, if the court at the time the objection is made refuses the exception; and if the disagreement does not arise until the time of the settling of the bill of exceptions, then the said statement may be made and filed within ten days of that time, and not otherwise. Within ten days thereafter the adverse party may file a statement of objection as prepared or approved by the court, together with the affidavits of not more than three respectable and disinterested persons, or the affidavits of himself and the stenographer who took the same down, concerning the truth or falsity of the statement of the exception as filed by the counsel, and prepared or approved by the court. Each statement of the exception, and all affidavits concerning either of them when filed as herein required, shall be deemed a part of the record of the cause, and upon an appeal or review, the appellate court must first ascertain therefrom the truth of the matter as far as possible, and then determine the law arising thereon. The court must allow the coun-

sel a reasonable time to procure the verification of his statement as herein required; and all affidavits of said persons shall be taken by the clerk of the court, who must certify thereon, if he is satisfied of the fact that the person is respectable and disinterested."

*Arguendo* the majority opinion urges that a dispute is not apparent concerning the subject matter of the bill of exceptions so as to call for the sworn statement by counsel for the defense and other persons mentioned in the statute. Throughout the original bill before us are erasures of the phrase "exception taken and allowed," and the typewriting of the document is not uniform, indicating that pages were rewritten and inserted before it received the official signature of the trial judge. All this tends to show that the judge and defendant's counsel were not in accord about the frame of the bill at the time it was settled. The dispute must have arisen then on August 10, 1918, the date of the settlement of the bill. The affidavits were filed on the seventeenth of the same month, within the ten days allowed by statute. Nay, more; although the objectionable speech of the public prosecutor and the ruling of the court thereon are set out at large in the brief for the defendant they are not challenged in the brief of the prosecution. Under such circumstances it ill becomes this court to say in effect that the question is not before us. In that respect we ought not to assume to be wiser than counsel for the state.

The contention is made that there is no evidence that the stenographer is competent and allusion is made to what is styled the fragmentary report of the district attorney's address to the jury. It is barely possible that in the hurry and excitement of a closely contested murder case the diction of the

prosecutor may not have been perfectly clear and coherent. It may be, too, that an absolutely *verbatim* report of his language throughout his speech under such circumstances would not read so well as the orations of Webster, Everett or Calhoun, who spoke after careful preparation. It is not impossible that the fragmentary language in the early part of the address is due to the speaker rather than the reporter. The contention on that point may be dismissed by reference to the certificate of the clerk, which states that the stenographer in question is both competent and respectable.

In making up the document necessary to present his case on appeal the defendant is not irrevocably bound by the report of the official stenographer, the appointee of the judge whose rulings are drawn in question. The statute gives the defense the benefit of the report of any competent stenographer. It does not prescribe a standard of competency. We have then before us the affidavits mentioned, which the statute says "shall be deemed a part of the record." Under this mandate of the Code we cannot exclude them. It is true, the clerk while certifying that the stenographer is competent and that both she and Miss Beiberstadt, another affiant, are respectable, does not state unreservedly that they are disinterested. The statute does not make his certificate indispensable to the competency of such affidavits. His qualifying reservations only affect the weight to be given to those sworn statements. But, whether the two affiants besides defendant's counsel are disinterested or not, we have the alternative showing of counsel's affidavit and that of the stenographer who took down the language of the district attorney.

Trial judges are human beings, subject to pride of opinion and often to an ambition to make a good record of affirmances on appeals from their decisions. This statute is remedial in its nature, designed to give relief in cases where disputes about bills of exceptions arise between fallible judges and fallible counsel. In the instant case, without making any imputation against the trial judge whose standing as a man and a jurist is so excellent, it is enough to say that the question of the misconduct of the district attorney is in the record for our decision and no amount of special pleading or quibbling can rightly take it out. On the merits of this branch of the case we are confronted with three affidavits upon which, if false, perjury can be predicated. There is nothing whatever to oppose them. Neither the judge nor the district attorney, nor any respectable and disinterested person furnishes any sworn statement to the contrary. The Code says that from such affidavits we must determine the truth of the matter. The official bill of exceptions is neither all sufficient nor self-sustaining. It is laid aside in the settlement of the dispute about its accuracy. As the law declares, we must ascertain the truth from the affidavits. On the objectionable language of the district attorney, the objection of the defendant's counsel and the ruling of the court thereon, these sworn statements are clear and explicit. To refuse to give them effect is to shut our eyes against the undisputed record and it would belittle the intelligence of the trial judge to intimate that the objection of defendant's counsel is too complicated to present to the Circuit Court the question involved.

Since there is no contrary showing, that made by the defendant as to the exception must be taken as true. Attached to the bill of exceptions is a com-

plete report of all the testimony in the case. On direct examination the witness Dutton testified to the presence of a man near the gap in the fence at the west boundary of the defendant's land, but did not pretend to say who the man was, although he was within 15 feet of him and the moon was shining brightly. On cross-examination he testified thus:

"Q. Mr. Dutton, are you acquainted with the defendant?

"A. Yes, sir.

"Q. How long have you known him?

"A. Oh, I say four years anyhow, and maybe a little longer.

"Q. Did you see him frequently?

"A. Yes, sir.

"Q. How often about, would you see him?

"A. Oh, sometimes every day; he has worked for me on the road, him and his boys and all three of them.

"Q. Could you recognize his boys from their appearance?

"A. Yes. Yes, I know him.

"Q. Well, in fact, you are very well acquainted with him, aren't you?

"A. Yes, sir.

"Q. Well, who was it that you saw there that night at the fence?

"A. Oh, I don't—I could not say.

"Q. You don't know?

"A. No, sir, I don't know. I could not say."

The witness Jackson testified in similar strain about the presence of a man at the point mentioned. On direct examination he testified thus:

"Q. Do you know this defendant, W. E. Butler?

"A. I don't know as I ever met him."

And on cross-examination he gave the following testimony:

"Q. Where was this man you have been testifying about when you first saw him?

"A. I don't know what you mean.

"Q. Well, this man with a gun, isn't that what you have been testifying about?

"A. Yes.

"Q. Where was he?

"A. When I first saw him?

"Q. Yes.

"A. He was in the fence.

"Q. Who was?

"A. I don't know.

Judged by the official data in the record, the district attorney was in error in his statement to the jury that Dutton and Jackson asserted as a fact that the defendant was at the other end of the road with a Winchester, the truth being that they did not know who the man was.

"It is reversible error for the prosecuting attorney in his argument to the jury to assert facts and circumstances as being in the case which are not shown by the evidence, or to comment upon such facts, or to draw inferences from them unfavorable to the accused": 12 Cyc. 574.

In the note to *McDonald* v. *People*, 126 Ill. 150 (18 N. E. 817, 9 Am. St. Rep. 547, 559), it is said:

"It may be regarded as an established rule that it is error, sufficient to reverse a judgment, for counsel, against objection, to state facts pertinent to the issue, and not in evidence, or to assume in argument that such facts are in the case, when they are not: Hilliard on New Trials, 225; Proffatt on Jury Trial, § 250; *McAdory* v. *State*, 62 Ala. 154; *Cross* v. *State*, 68 Id. 476; *Wolffe* v. *Minnis*, 74 Id. 386; *Little Rock Ry. Co.* v. *Cavenesse*, 48 Ark. 106 (2 S. W. 505); *People* v. *Mitchell*, 62 Cal. 411; *Newton* v. *State*, 21 Fla. 53; *Berry* v. *State*, 10 Ga. 511; *Mitchum* v. *State*, 11 Id. 615; *Dickerson* v. *Burke*, 25 Id. 225; *Yoe* v. *People*, 49 Ill. 410; *Felix* v. *Scharnweber*, 119 Id. 445 (10 N. E. 16); *Chicago etc. R. R. Co.* v. *Brogonier*, 13 Ill. App. 467; *Chase* v. *City of Chicago*,

20 Id. 274; *Ferguson* v. *State*, 49 Ind. 33; *Kinnaman*
v. *Kinnaman,* 71 Id. 417; *Combs* v. *State,* 75 Id. 215;
*Rrow* v. *State,* 103 Id. 133 (2 N. E. 296); *Rudolph* v.
*Landwerlen,* 92 Id. 34; *School Town of Rochester*
v. *Shaw,* 100 Id. 268; *Martin* v. *Orndorff,* 22 Iowa,
504; *Hall* v. *Wolff,* 61 Id. 559 (16 N. W. 710);
*Henry* v. *Sioux City etc. Ry. Co.,* 70 Id. 233 (30
N. W. 630); *Huckell* v. *McCoy,* 38 Kan. 53 (15 Pac.
870); *Rolfe* v. *Rumford,* 66 Me. 564; *Taft* v. *Fiske,*
140 Mass. 250 (5 N. E. 621, 54 Am. Rep. 459); *Scripps*
v. *Reilly,* 35 Mich. 371 (25 Am. Rep. 575); *Rickabus*
v. *Gott,* 51 Mich. 227 (16 N. W. 384); *People* v. *Dane,*
59 Id. 550 (26 N. W. 781); *Martin* v. *State,* 63 Miss.
505 (56 Am. Rep. 813); *Gibson* v. *Zeibig,* 24 Mo.
App. 65; *Cleveland Paper Co.* v. *Banks,* 15 Neb. 20
(16 N. W. 833, 48 Am. Rep. 334); *Bullis* v. *Drake,*
20 Neb. 167 (29 N. W. 292); *Tucker* v. *Henniker,*
41 N. H. 317; *Bullard* v. *Boston & Maine R. R. Co.,*
64 Id. 27 (5 Atl. 838, 10 Am. St.. Rep. 367); *Baldwin*
v. *Grand Trunk Ry. Co.,* Sup. Ct. N. H., July, 1888
(64 N. H. 596, 15 Atl. 411); *Perkins* v. *Bur-*
*ley,* Sup. Ct. N. H., July, 1888 (64 N. H. 524,
15 Atl. 21); *Fry* v. *Bennett,* 3 Bosw. (N. Y.)
200; *Reich* v. *Mayor etc. of New York,* 12 Daly
(N. Y.), 72; *Jenkins* v. *North Carolina Ore Dress-*
*ing Co.,* 65 N. C. 563; *Union C. L. I. Co.* v.
*Cheever,* 36 Ohio St. 201 (38 Am. Rep. 573); *Willis*
v. *McNeill,* 57 Tex. 465; *Galveston etc. R. R. Co.* v.
*Cooper,* 70 Id. 67 (8 S. W. 68); *House* v. *State,* 9
Tex. App. 567; *Conn* v. *State,* 11 Id. 390; *Grosse* v.
*State,* 11 Id. 364; *Laubach* v. *State,* 12 Id. 583; *Clark*
v. *State,* 23 Id. 260 (5 S. W. 115); *Tillery* v. *State,*
24 Id. 251 (5 S. W. 842, 5 Am. St. Rep. 882); *Brown*
v. *Swineford,* 44 Wis. 282 (28 Am. Rep. 582); *Brem-*
*mer* v. *Green Bay etc. R. R. Co.,* 61 Wis. 114 (20
N. W. 687); *Hardtke* v. *State,* 67 Id. 552 (30 N. W.
723); *Sasse* v. *State,* 68 Id. 530 (32 N. W. 849).''

In *State* v. *Hatcher,* 29 Or. 309, 315 (44 Pac. 584,
586), Mr. Justice MOORE, speaking for the court,
said:

"The rule is universal that it is error to allow an attorney, in an argument, over his adversary's objection, to go outside the evidence and comment on facts assumed to have been proved, and that an exception to the action of the court in permitting it will be reviewed' on appeal: Elliott on Appellate Procedure, § 672; Proffatt on Jury Trial, § 250. In *Tenny* v. *Mulvaney,* 8 Or. 513, LORD, C. J., in discussing this question, says: 'It is held to be the strict duty of the court to arrest an argument not based on evidence. And if objection be made to this course of argument, it is error for the court to permit it, and a new trial will be granted.' "

In *State* v. *Blodgett,* 50 Or. 329, 342 (92 Pac. 820, 825), the court used this language:

"When the party who is injured by the wrong calls for the intervention of the court by an objection, it will not do for the court to remain silent, leaving the matter of misconduct with the offending party and the jury. The court is bound to interpose when so called upon, and, if an improper and injurious statement has been made without excuse, the effect of it should be erased from the minds of the jury, then and there, by an emphatic and explicit admonition from the court: *Nelson* v. *Welch,* 115 Ind. 270 (16 N. E. 634, 17 N. E. 569). It may be said with equal propriety that the district attorney, although charged with the duty of prosecuting the defendant, has an equal responsibility with the court in seeing that the defendant has a fair and impartial trial. The evidence offered should be legal and pertinent, fairly and impartially stated to the jury, and the deductions and arguments therefrom legitimate and candid. If in the prosecution it should happen, by inadvertent or hasty expression or otherwise, that improper and injurious statements are made to the jury, it is the duty of the offending party to make it appear by the record that nothing reasonably proper to be done was omitted in order to rectify the wrong and restore to the trial the fairness of which he presumably divested it."

In *Tucker* v. *Henniker,* 41 N. H. 317, 325, the court used ·this language:

"When counsel are permitted to state facts in argument, and to comment upon them, the usage of courts regulating trials is departed from, the laws of evidence are violated, and the full benefit of trial by jury is ˙denied. It may be said, in answer to these views, that the statements of counsel are not ,evidence; that ,the court is bound so to instruct the jury, and that they are sworn to ·render their verdict only according to evidence. All this is true; yet the necessary effect is to bring the statements of counsel to bear upon the verdict with more or less force, according to circumstances; and if they in the slightest degree influence the finding, the law is violated, and the purity and impartiality of the trial tarnished and weakened. If not evidence, then manifestly the jury have nothing to do with them, and the advocate has no right to make them. It is unreasonable to believe the jury will entirely disregard them. They may struggle to disregard them; they may think they have done so, and still be led involuntarily to shape their verdict under their influence. That influence will be greater or less, according to the· character of the counsel, his skill and adroitness· in argument, and the force and naturalness with which he is able to connect the facts he states with the evidence and circumstances of the case. To an extent not definable, yet to a dangerous extent, they unavoidably operate as evidence which must more or less influence the minds of the jury, not given under oath, without cross-examination, and irrespective of all those precautionary rules by which competency and pertinency are tested."

In *State* v. *Gutekunst,* 24 Kan. 252, the court said:

"Where counsel refers to pertinent facts not before the jury, or appeals to prejudices foreign to the case, it is the duty of the court to stop him then and there. The court need not and ought not to wait to hear objection from opposing counsel. The dignity

of the court, the decorum of the trial, the interest of truth and justice forbid license of speech in arguments to jurors outside of the proper scope of professional discussion. We conclude with the words of Mr. Justice Valentine, speaking for the court, in *State* v. *Comstock,* 20 Kan. 655: 'Courts ought to confine counsel strictly within the facts of the case; and if counsel persistently go outside of the facts in their argument to the jury, then the court should punish them by fine and imprisonment; and if they should obtain a verdict by this means, then the court should set such verdict aside.' ''

The following excerpt is taken from the language of the court in *People* v. *Aikin,* 66 Mich. 460 (33 N. W. 821, 829, 11 Am. St. Rep. 512, 527):

"There can be nothing gained in the end by an overzealous and unfair perversion of facts, in order to convict an accused person of a crime of which the prosecutor may have good reason to believe him guilty, and which, as in this case, may be hard to establish by the ordinary and established methods of procedure. While the zeal of the prosecutor may be well excused, and the hot and bitter language that comes from the heart, involuntarily, of one who is thoroughly impressed with the heinousness of the crime and the guilt of the respondent, is to be expected in such cases, it is nevertheless the duty of the court sitting impartially between the people and the prisoner to check and control any intemperance of zeal or language that is not warranted by the facts and circumstances shown by the proofs. If this is done, as it was not in this case, the final court of review, removed entirely from the passion and prejudice that generally surround the trial in the lower courts of cases of this nature, will see to it that the injustice is corrected, and a new trial granted.

"By this permission of unfair and unjust conduct on the part of the public prosecutor or his assistants, not only is the course of justice perverted, but added cost and delay are the natural consequences

of the attempt of the court of last resort to give to
every citizen accused of crime the protection granted
by the constitution,—a fair trial before an impartial
jury.

"It must also be remembered, that however hein-
ous the crime, and however difficult it may be to es-
tablish it by the usual and approved means of
procedure, and no matter how firmly the public pros-
ecutor and the community at large may be satisfied
of the guilt of the accused, and even though in fact
he may be guilty, the rules and methods of trial per-
mitted to be relaxed or disregarded in his particular
case, with perhaps the laudable object and desire
that justice may be done, must, nevertheless, as a
natural consequence of the ways of our jurispru-
dence, appear hereafter as so relaxed or disregarded
as precedents to be used against all persons accused
of crime, to vex the innocent as well as the guilty.
There is therefore no safety and no justice in allow-
ing the supposed merits of a particular case to over-
ride and set aside, even for a moment, the barriers
that our constitution and laws have hedged about the
citizen when arraigned and put upon trial for an
alleged crime."

Precedents sustaining the same doctrine could be
cited almost without number.

Whether designedly, or inadvertently in the heat
of argument, the prosecutor misrepresented the tes-
timony, saying Dutton and Jackson asserted that the
defendant was at the west side, when in fact they
both said they did not know who the man was whom
they saw there. If we may call black white, then
only is the district attorney's statement in accord
with the testimony. Against the explicit objection
of the defendant's counsel the court refused relief
and left the whole matter to the jury in palpable vio-
lation of the doctrine of *State* v. *Blodgett,* 50 Or.
329, 342 (92 Pac. 820, 825), and *State* v. *Hatcher,*

29 Or. 309, 315 (44 Pac. 584, 586), decided heretofore in this court.

All the testimony about the action of the unidentified man on the west side of the defendant's premises should have been kept out of the case because that transaction had no necessary connection with the admitted homicide. It is not within the doctrine of *State* v. *La Rose,* 54 Or. 555 (104 Pac. 299), cited in the majority opinion. There the murder was committed by the use of a piece of rusty gas-pipe wrapped in paper. As it was proved that this method of homicide was novel and unusual, the court received evidence of other practically identical assaults in the immediate vicinity of the place where was committed the one in question, in one of which the defendant was identified. On this ground alone this court justified the action of the Circuit Court, putting the case under the fourth division of the classification delineated by Mr. Justice MOORE in *State* v. *O'Donnell,* 36 Or. 222 (61 Pac. 892).

In the instant case there is nothing novel or peculiar about pointing the gun that would tend to isolate the defendant from all other individuals who did the same act. It is believed to be the universal rule that those who slay others by the use of a firearm point the weapon toward the victim, and so there is nothing to put this case into the category of exceptions mentioned by Mr. Justice MOORE. But if we consider that the evidence was admissible, it was gross error for the district attorney even unintentionally to misstate the evidence, and it was still more erroneous for the court to make the ruling it did and in the language used. It was wrong for it to be left to the jury to decide whether the statement of the district attorney was relevant or not. The language

of the court gave sanction and credence to the unwarranted statement of the district attorney and of itself constitutes reversible error, as taught by the practically unanimous precedents from the earliest times.

Another assignment of error relates to testimony given in rebuttal by the witness Patrick on behalf of the state. Over the objection of the defendant, the witness was allowed to state that during the day immediately preceding the night of the shooting he had a conversation with the decedent about watching the road. The witness went on to testify as follows:

"He made the statement that he was going over and hide and watch until whoever was putting up the fence came up and then he would run out and see if he could identify them the same as you try to identify everyone on the street, to get close enough to do that was his idea, he thought maybe the party that was putting it up would run so quick he could not get to see him; he was going to run out so quick he could get there in time to see who the party was.

"Q. He was unable—state whether or not he was able to run very fast.

"A. He was lame in one foot, a little lame, and owing to that he doubted whether he could get out there.

"Q. Was there any further plan or procedure entered into at that time as to what he would do further in case anything would happen?

"A. I asked him what he would do if he did not run."

The defendant's counsel at that point objected to the conversation being detailed, but the court directed the witness to answer, allowing an exception to the defendant. The witness answered:

"I asked him what he would do if they would run. Well he says, 'They won't run because they won't

96 Or.—19

want to be identified.' Well I says, 'Supposing they
commence to shoot.' Well, he says, 'I will shoot,
too, then.' "

Throughout the case the prosecution brought to
the fore the theory that all these individuals con-
cerned in the opening of the road, including the
decedent, were on the scene simply for the purpose
of detecting who was laying up rails across the sup-
posed road. No intimation is given in the testi-
mony that the defendant knew anything of the pur-
pose of the men who appeared on the west side of
his premises and claim to have discovered an un-
known man at the fence, who pointed his gun at
them. Neither is there imputed to him any knowl-
edge of the fact, if it was a fact, that the decedent
was engaged in the same enterprise of watching
the road on the east side. The prosecution thus
seeks to bind the defendant by what at best may be
said to have been the actual situation, whereas,
under all the authorities, the defendant is entitled
to rely upon the apparent danger of the situation as
viewed by a reasonable man in his circumstances
under all the surrounding facts as they appeared to
him. It is enough for illustration to cite the case
of *State* v. *Miller*, 43 Or. 325 (74 Pac. 658), and the
Oregon precedents there noted. Conceding for the
sake of the discussion that it was the defendant on
the west side of the field, whom Dutton and Jack-
son discovered, the defendant was there confronted
with the situation of some prowlers on his own prem-
ises, without any knowledge, so far as the evidence
discloses, of why they were there or where they went
when they left. Within a short time afterward, ac-
cording to the testimony, he was assailed by a fusi-
lade of shots coming from an unknown source and
fired from the ambush of the trees outside of his

.premises on the east side. He was still. on his own ground. It it true, he was carrying his rifle, but he was in the exercise of a right especially guaranteed to him by our Constitution, to bear arms for his own defense: Const., Art. I, § 27. Attacked, as the testimony shows, from ambush without knowledge of the number or character of his assailants, he had the right to act upon the appearance of danger thus brought about. He was not bound or controlled by the actual purposes of the decedent, which to him were unknown and which he had no means of ascertaining. To admit this testimony is a misapplication of the doctrine of the majority opinion in *State* v. *Farnam*, 82 Or. 211 (161 Pac. 417, Ann. Cas. 1918A, 318). There, one of the principal questions in the case was the identity of the charred remains found in a barn which had been burned. It was important to show that the decedent, Edna Morgan, had gone to that barn with the defendant, and hence the majority of the court decided that the state was entitled to show that on the day previous to the homicide she had said she could not go home with some girl friends of hers, because the defendant was coming to see her. Here, no such situation arises. No question was made about the identity of the decedent. The homicide was admitted. The defendant relied upon self-defense. Under these circumstances to admit testimony such as was given by Patrick, and that, too, in rebuttal, is to allow an antagonist in anticipation of an affray to make a self-serving declaration to his friends of a harmless design on his part, when in fact he is going out to snipe at his adversary.

In principle, the situation presented is similar to that portrayed in *Wirth* v. *Richter,* 63 Or. 114 (126

Pac. 987). There Richter's contention was that he
had employed Wirth to attend a sale and buy a horse
for the former, and that, having bought the horse
for him, Wirth had overcharged him in the claim for
reimbursement. Wirth maintained that he bought
the horse on his own account and afterward sold it
to Richter, and to sustain his theory offered to prove
that before he went to the sale he stated to several
people, but in the absence of Richter, that he, Wirth,
was going to buy the animal for himself. The court,
Mr. Justice MOORE writing the opinion, said:

"The declarations undertaken to be proved were
self-serving and, being no part of the *res gestae,*
they were inadmissible."

So here, the declarations of Stewart made in the
absence and without the knowledge of Butler were
self-serving, no part of the *res gestae,* irrelevant
and incompetent as against the defendant. If Stew-
art had lived and appeared as a witness for the state
in a prosecution of Butler for assault with intent
to kill, he would not have been permitted to state his
previous declarations to other parties not in the
presence and without the knowledge of the defend-
ant. The fact that he died cannot in sound reason
make those declarations competent evidence. Where
the liberty of a defendant is involved, the rule of
evidence ought to be at least as favorable to him as
in a dispute about a horse trade.

In the absence of any showing whatever that the de-
fendant knew the alleged peaceful purpose of the
decedent, such testimony cannot properly be ad-
mitted against him. The whole theory of the prose-
cution was to control the defendant by the possibly
harmless attitude of the people who were prowling
about his premises at night, whereas the consensus

of authority is that the defendant is entitled to act upon the reasonable appearance of danger, as it would seem to a reasonable man in his situation at the time, although there was in fact no danger, as the sequel would prove.

The majority opinion sanctions a gross misrepresentation of the testimony by the prosecutor, a practice condemned by a great multitude of precedents, including our own decisions. It authorizes a judge to lecture the jury, a co-ordinate branch of his court, as though it were composed of willful school-boys and to dragoon it into a verdict. It compels a defendant at his peril to be able to show in his defense that his assailant intended to commit a felony or that the appearances were indicative of felonious intent, irrespective of the fact that great bodily harm may be inflicted upon an individual without the commission of any actual felony, and lastly, the defendant is bound by what his antagonist may have previously said in a self-serving declaration, without regard to the appearances of danger created by the latter.

For these reasons I dissent from the conclusions of the majority of the court.